FOURTH DIVISION

Nos. 1-08-0898 and 1-08-0900 (consolidated)

IN THE APPELLATE COURT
OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| IN THE INTERESTS OF: | ) | Appeal from the |
| | ) | Circuit Court of |
| D.W., V.R., and N.B., JR., | ) | Cook County |
| | ) | |
| Minors-Respondents-Appellees, | ) | Nos. 06 JA 642 / |
| | ) | 06 JA 643 / |
| (THE PEOPLE OF THE STATE OF ILLINOIS, | ) | 06 JA 644 |
| | ) | |
| Petitioner-Appellee, | ) | Honorable |
| | ) | Sandra Otaka, |
| v. | ) | Judge Presiding. |
| | ) | |
| B.M.-B. and N.B., SR., | ) | |
| | ) | |
| Respondents-Appellants.) | ) | |
| | ) | |

JUSTICE GALLAGHER delivered the opinion of the court:

B.M.-B. and N.B., Sr., bring this consolidated appeal contending that the juvenile court

erred in its adjudicatory finding that D.W., V.R. and N.B., Jr., (hereinafter referred to collectively

as "minors") were abused and neglected.  Respondents-appellants contend that V.R.'s testimony

was not credible and that she had motives for lying about being sexually abused by N.B., Sr.

Respondents-appellants further contend the juvenile court erred in its dispositional finding that

1-08-0898 and 1-08-0900 (consolidated)

they were unable to care for, protect, train or discipline their children, as they complied with the requested assessments and services and demonstrated an ability to care for the minors. For the reasons that follow, we affirm the trial court's adjudicatory and dispositional orders.

## I. BACKGROUND

B.M.-B. is the mother of two sons, D.W. and N.B., Jr., and two daughters, V.R. and E.M..[1] She is married to N.B., Sr., the father of N.B., Jr. The remaining minors each have different fathers. As the result of a hotline call in July 2006, the Illinois Department of Children and Family Services (DCFS) began an investigation of the family due to allegations of sexual abuse. V.R., who was ten years old at the time, said her stepfather, N.B., Sr., had been sexually abusing her since she was seven.

Initially, DCFS entered into an agreement with B.M.-B. that she would keep N.B., Sr., out of the home while DCFS conducted its investigation. A safety plan was put in place, under which the minors were initially removed from the home. A DCFS inspection indicated N.B., Sr., was no longer living in the home, and the minors were then returned to the home. However, after a report from one of the minors that N.B., Sr., continued to be in the home, DCFS took protective

---

[1] E.M.'s case was part of the same adjudicatory hearing, but her dispositional hearing was held prior to that of her siblings. B.M.-B. appealed the adjudicatory and dispositional orders entered for E.M. under Appellate No. 1-07-2530. On January 11, 2008, this court granted B.M.-B.'s counsel's motion to withdraw pursuant to *Pennsylvania v. Finley*, 481 U.S. 551 (1987), and affirmed the juvenile court's adjudicatory and dispositional orders with respect to E.M.

1-08-0898 and 1-08-0900 (consolidated)

custody of all four minors on September 13, 2006.

A. Adjudicatory Hearing

During the adjudicatory hearing, which commenced May 25, 2007, V.R. testified in the presence of the trial court judge and the attorneys for each party, and was subject to cross-examination. V.R. testified that she was currently living with her paternal great-grandmother because her stepfather, N.B., Sr., had been sexually touching her when she lived in her mother and stepfather's home. V.R. told the trial court she was seven years old the first time her stepfather touched her in a sexual way.

V.R. testified that her stepfather told her they were just playing a game, that it was nothing bad, and not to tell anyone. The first game he made up was called "slam hug." They would both have their clothes off and her stepfather would slam her on the bed and get on top of her. V.R. said she could not remember what he would do while he was on top of her.

A second game they played was called "act it out." N.B., Sr., would show V.R. pornographic movies and then make V.R. do what the woman in the movie was doing. V.R. remembered that the name of one of the movies was "Booty Call." In that movie, a nude woman would dance and shake her buttocks in the man's face and N.B., Sr., would make V.R. do the same thing.

In another movie, a nude woman in high heels would walk into the room where a man was sitting on the couch, unzip his pants, and suck his penis. V.R. testified that after they watched this movie, N.B., Sr., then made her come in the room, unzip his pants, and suck his

3

penis. She said that after she finished, some white or clear stuff came out of her stepfather's penis and that he got a towel and wiped it off. V.R. testified that she had to play this game more than once, but she could not remember how many times she had played it.

A third game they played was called "name the body part." V.R. could not remember how old she was when they started playing this game, but said it did not start until she was eight or nine. N.B., Sr., would tell V.R. to take all of her clothes off and then he would touch different body parts and name them. V.R. said that in order to make it seem like it was not a bad thing, her stepfather would start by touching her ears. He would then go down and touch the outside of her vagina.

The final game they played was called "squeeze hug." In this game, they would both have their clothes off and N.B., Sr., would press his penis toward V.R.'s vagina and they would hug. V.R. testified that they played this game at the last place they lived on Cottage Grove, but she did not remember when it started.

V.R. testified that when she was seven, the family lived on 43rd Street and the landlord was called "Big Eyes." They then moved to the home of C.L., N.B., Sr.'s grandmother. When she was eight, they moved to an apartment with a landlord by the name of Nina. They then moved to the home of Tony, N.B., Sr.'s cousin, while V.R. was still eight. When she was nine, they moved to a house on Cottage Grove, where B.M.-B. and N.B., Sr., still reside. V.R. testified that N.B., Sr., touched her in a sexual way at each of these residences.

V.R. testified that when she was about eight years old, she told her older brother, D.W., that N.B., Sr., was touching her. V.R. said that D.W. knew something was going on because she

4

was always in the room with N.B., Sr. D.W. told V.R. that she should tell their mother. V.R. responded that she was not sure right then, and D.W. told her that whenever she wanted to tell their mother, he would go with her.

V.R. remembered that she was living in Tony's house the first time she told her mother, and she was eight years old when they lived in Tony's house. V.R. said that D.W. was with her and he told B.M.-B. that N.B., Sr., had been touching V.R. V.R. then confirmed the abuse. B.M.-B. started crying and said she believed V.R. However, V.R. testified that she figured her mother did not believe her because her stepfather remained in the home.

The second time V.R. told her mother about the abuse, they were living in the home on Cottage Grove and she was nine years old. V.R. testified that B.M.-B. responded, "Oh, here we go again." V.R. said that her mother again said she believed her and that later that same day, B.M.-B. had an argument with N.B., Sr., about V.R. N.B., Sr., said that V.R. was lying. V.R. testified that N.B., Sr., touched her again after she told her mother the second time.

In addition to telling her mother and brother about the sexual abuse, V.R. testified that she also told a teacher at the school she attended when they moved to the house on Cottage Grove, but said the teacher did not do anything either. V.R. was questioned about telling a DCFS investigator who visited their home that nothing happened between her and her stepfather. She testified that when the woman from DCFS came to their home, V.R. did not know who she was. The woman spoke with her mother first and then told V.R. to come in. V.R. had to go upstairs to use the bathroom, and she testified that her mother came upstairs to get her and told V.R. to tell the investigator that nothing happened.

5

On cross-examination, V.R. testified that N.B., Sr., had tried to put his penis in her vagina but it did not go all the way in. She said, "Ouch," but her stepfather continued to try to push his penis into her vagina, and V.R. testified that something clear or white came out of his penis. V.R. could not remember how old she was when this happened or how many times it happened, but testified that it happened more than one time.

V.R. also testified on cross-examination that she would wear a long T-shirt around the house with no underwear on underneath it. She testified that even after her mother told her to put her underwear on, she continued to go around the house without underwear because N.B., Sr., told her not to wear it. However, she testified that she did not tell her mother the real reason why she was not wearing underwear because she was afraid her mother would "whoop" her.

Karen Wilson conducted the initial investigation for DCFS. Wilson testified that she was finally able to reach B.M.-B. by telephone to follow up on the hotline call after attempting to visit and leaving several messages. Wilson informed the mother of the sexual molestation allegations and B.M.-B. responded that they were not true. Wilson told B.M.-B. to make sure V.R. was present for the victim sensitive interview (VSI). B.M.-B. also told Wilson that N.B., Sr., was not residing in the home at that time.

Wilson also interviewed D.W. at his paternal grandmother's house. D.W. told Wilson that V.R. informed him N.B., Sr., touched her body all over, including her private parts. V.R. told D.W. that their stepfather would make her wear T-shirts with no underwear underneath and he would touch her. D.W. told Wilson that on one occasion, N.B., Sr., told him to go to the park and stay there for two hours. D.W. said he took his two younger siblings with him but V.R.

remained at home with N.B., Sr. When D.W. returned to the house early, he said his stepfather hit him and then D.W. remained downstairs with his two younger siblings while N.B., Sr., took V.R. upstairs.

As part of one of the initial safety plans put into place by DCFS while the investigation was ongoing, V.R. was taken for a medical exam. The exam was conducted by Dr. Emily Sifferman, who also testified at the hearing. Sifferman first interviewed B.M.-B. Sifferman testified that B.M.-B. told her V.R. was there for an evaluation because on two occasions she had disclosed sexual abuse by her stepfather, N.B., Sr.

B.M.-B. told Sifferman that the first time V.R. told her about the abuse, N.B., Sr., was in jail and there was an incident with some missing money. After the mother confronted V.R. and D.W. about the money, V.R. disclosed the sexual abuse. B.M.-B. said V.R. told her N.B., Sr., had touched her breasts, butt and private part, that her clothes had been off, and that he was playing games when he did that. In the second disclosure, V.R. was more specific and B.M.-B said she wondered how V.R. knew some of the things she was telling her, so she took V.R. to the doctor.

Sifferman also interviewed V.R. separately. V.R. told Sifferman that her stepfather had been touching her private parts since she was 7 years old and the last time it happened was when she was 10. V.R. said she and her stepfather would play a game where she would name her body parts and he would touch them, but that mostly she would "do him." V.R. told Sifferman that N.B., Sr., would tell her what to do to his private part, and that he made her lick it and clear and white stuff came out. V.R. said on one occasion, the stuff went in her mouth and she had to rinse

it out.

V.R. also told Sifferman that her stepfather would touch her private part with his hands and sometimes it would go inside a little bit and she would push him away. N.B., Sr., tried to put his private part in V.R.'s private part, but it rubbed on her side and would hurt when he pressured down. V.R. told Sifferman that her stepfather put his private part on her butt.

Dr. Sifferman testified she gave V.R. an external medical exam and the results were normal. She further testified that most girls have normal exams after sexual abuse and that many types of sexual abuse, including what V.R. described, do not cause any injury. Even when injuries occur, the anal/genital area usually heals very quickly without a scar. Sifferman testified that V.R. described digital penetration, and genital and genital/anal contact. Dr. Sifferman's conclusion was that V.R. had been sexually abused. She based her conclusion on V.R.'s account of her history.

Carla Jackson, the DCFS supervisor in charge of the investigation, testified that she was present for V.R.'s VSI. The VSI took place in a neutral setting where V.R. was sitting on one side of a two-way mirror and DCFS, the State's Attorney, and some detectives were sitting on the other side. Jackson testified that V.R. stated in the VSI that she had been sexually abused by her stepfather, N.B., Sr., since the age of seven. During the interview, V.R. said that the first person she told was her brother, D.W., and that she also told her mother. V.R. said that when her mother confronted N.B., Sr., he said V.R. was a liar.

Jackson testified that V.R. said the sexual abuse consisted of N.B., Sr., asking her to lick his private parts and she described white stuff coming out of his penis. She said he would make

her watch pornographic movies and that they would also play games. V.R. described one game where N.B., Sr., would touch her private parts. V.R. said that in another game, called the slam game, they would both have their clothes off and her stepfather would press his private part up against her to a point where she described white stuff coming out of his penis and going onto the floor.

Jackson testified that V.R. also stated that N.B., Sr., would try to insert his finger into her vagina and that it hurt, and that he would also try to insert his penis into her vagina and she would push it out because that also hurt. V.R. said the abuse occurred in various rooms in the home and that her brother would have to leave the home or leave his room while it was going on.

Jackson also testified that she interviewed V.R.'s mother. B.M.-B. told Jackson that V.R. first disclosed the abuse to her in March 2005. She said V.R. pointed to her breasts and vagina and told her N.B., Sr had been "messing" with her and was playing a game called "touch me." B.M.-B. said that V.R. told her again that N.B., Sr., was still "messing" with her when they moved to their current residence. The mother told Jackson that in the second disclosure, V.R. said her stepfather was taking her into the pantry and asking her to take off her clothes.

B.M.-B. also testified at the hearing. She said that V.R. first disclosed the sexual abuse in March 2005 while N.B., Sr., was in jail. She said that she had confronted V.R. and D.W. about some missing money, and the two of them came to her the following day and told her that N.B., Sr., was "messing" with V.R. B.M.-B. testified that after the first disclosure, she took it upon herself to investigate the allegations by following V.R. and N.B., Sr., around the house after he was released from jail to see if they acted differently with each other. She said that she also

9

confronted N.B., Sr., and told him exactly what V.R told her and he said it was not true. B.M.-B. testified that she took V.R. to the doctor in March 2006 to follow up on her first sexual abuse allegation.

B.M.-B. further testified that V.R. told her in June 2006[2] that N.B., Sr., was still sexually abusing her. This time, V.R. said that N.B., Sr., used a douche bottle. B.M.-B. asked V.R. when this occurred, and V.R. said in the basement on a pole. B.M.-B. stated they do not have a pole in the basement. V.R. also told her the abuse occurred in her mother's bedroom and in the bathroom. B.M.-B. said she took V.R. to the doctor to be examined the following week. She testified that she waited a week because that was the first appointment she could get, and that she did not consider taking V.R. to the emergency room.

N.B., Sr., testified that he never sexually abused his natural child or any of his stepchildren. No further questions were asked of N.B., Sr.

At the conclusion of the adjudicatory hearing, the court found that V.R. was repeatedly sexually abused by N.B., Sr., and that B.M.-B. knew or should have known of the abuse. The court found the remaining minors were at substantial risk of injury and their environment was injurious because their sibling was sexually abused for two to three years, there were threats of violence and corporal punishment, and their mother failed to protect them.

---

[2]There is some confusion in the record as to when the second disclosure took place. B.M.-B. initially testified that the second disclosure happened after they moved into the home on Cottage Grove, which was not until June 2006. On cross-examination, she testified that the second disclosure took place in March 2006.

B. Dispositional Hearing

The case then proceeded to a dispositional hearing in February 2008, due to a number of continuances for what the trial court characterized as "very legitimate reasons," involving documents that were not tendered, unavailable witnesses, and medical emergencies.

Janelle Allen, the DCFS caseworker assigned to the minors, testified that while B.M.-B. had completed parenting and domestic violence classes, and had participated in drug and alcohol screening, she had not yet completed individual therapy or nonoffender training. Allen said that individual therapy had been discontinued in July 2007 because the therapist felt B.M.-B. was not meeting her treatment goals of discussing and resolving the issues that brought this case to DCFS. The therapist thought there may be some psychological problems and discharged her from therapy with the request that a psychological evaluation be completed.

The referral for the psychological evaluation was delayed because B.M.-B tested positive for marijuana and DCFS would not process the referral until she completed drug treatment services and received negative test results for drugs. The psychological evaluation was finally completed and B.M.-B. was again referred for individual therapy at the end of December 2007. Allen testified that the mother was willing to participate in individual therapy, but a number of mix-ups with the assignment of a therapist had delayed the start of therapy, and as of the date of the hearing, B.M.-B.'s individual therapy had not resumed.

Allen explained that nonoffender training is a service to educate B.M.-B. about the type of abuse V.R. experienced and teach her about the signs and symptoms of sexual abuse so she

11

knows what to look for in the future. Allen testified that B.M.-B. did not complete this training initially because she was in several other programs and services. DCFS is currently looking into including this service in her individual therapy to accommodate her work and school schedules.

As for N.B., Sr., Allen testified that he completed parenting classes and his random drug tests were all negative. N.B., Sr., also completed a sexual offender assessment, but Allen testified this assessment did not include the recommendations made by the therapist for a sexual perpetrator assessment. DCFS referred him again for a sexual perpetrator assessment, but the assessment had not taken place at the time of the hearing because N.B. Sr.'s attorney objected to language in the consent form he was asked to sign.

Allen testified that N.B., Sr., is currently engaged in individual therapy but does not attend consistently. He also needs to complete domestic violence classes for perpetrators. He is supposed to attend weekly but the most recent report shows that he only attended twice in the last two months.

Allen testified that the two older children, D.W. and V.R., have not been interested in regular visits with B.M.-B. She said that D.W. told her he is angry with his mother because of the current situation and does not want to visit with her. V.R. is receiving individual therapy. Her therapist has determined that at the present time, V.R.'s visits with B.M.-B. should only occur in a therapeutic setting with a mental health professional present. V.R. told Allen she does not want to discuss her abuse with her mother and does not feel comfortable having the visits with just her and another therapist present. Allen testified that B.M.-B.'s continued denial of the sexual abuse is causing emotional problems for V.R.

Brenda Golden, a therapist at New Hope Community Service Center, testified that she conducted the initial sex offender assessment of N.B., Sr. Golden testified that the assessment tools she used with N.B., Sr., were based on her understanding that there were allegations of sexual abuse against him, but no convictions or findings by a court. Golden said that if she had known of the juvenile court's finding of sexual abuse, she would have used a different assessment tool, known as STATIC–99.

Golden further testified that the assessment tool she used for N.B., Sr., is known as the sexual judgment inventory. She said the assessment results showed the truthful scale and the sexual inventory truthfulness scale were in the problem range. However, Golden said the final results are not based only on the assessment tool but also on the personal interview she conducted. Although the assessment tool indicated N.B., Sr., was attempting to minimize problems or concerns, Golden testified that she disagreed with that conclusion because he was frank and open in the interview. The assessment tool also indicated N.B., Sr., was attempting to minimize or even conceal sex-related interest or information. However, Golden noted that there were no verbal or nonverbal indicators of deception based on her interview.

Dr. Robert Heller, the chief psychologist at Interaction Dynamics, testified that he performed the psychological evaluation of B.M.-B. after her individual therapy was discontinued. Heller found no evidence of mental illness or personality disorder. He testified that B.M.-B. has the intellectual ability and the capability necessary to protect her children from dangerous situations. Heller said that while he cannot predict that B.M.-B. will always make the choice to protect her children, she has the capacity to make that choice.

1-08-0898 and 1-08-0900 (consolidated)

The court found that it was in the best interest of the minors to be made wards of the court. The court also found that each of the parents was unable to care for, train, and discipline the minors for reasons other than financial circumstances alone. The case was continued for permanency.

## II. ANALYSIS

As a preliminary matter involving both the trial court's adjudicatory and dispositional orders, the public guardian contends that parents-respondents have waived any issues regarding both orders because they have not included the medical records exhibit from the adjudicatory hearing or the group exhibit from the dispositional hearing in the record on appeal. The group exhibit included assessment, evaluation and counseling reports for the parents as well as certificates of completion for services ordered by DCFS.

In general, the burden is on the appellant to present a satisfactory record. *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92, 459 N.E.2d 958, 959 (1984). A reviewing court may consider an appeal despite deficiencies in the record where the trial transcripts sufficiently convey the necessary information. *Lisowski v. MacNeal Memorial Hospital Ass'n*, 381 Ill. App. 3d 275, 282, 885 N.E.2d 1120, 1129 (2008). Any doubts arising from the incompleteness of the record will be resolved in favor of the appellee. *Foutch*, 99 Ill. 2d at 392, 459 N.E.2d at 959.

Parents-respondents reply that the medical records for V.R. were all included in the record on appeal, and they cite the volumes and pages containing these records. The fact that the records were not provided in the same form as the exhibit at the adjudicatory hearing does not

14

1-08-0898 and 1-08-0900 (consolidated)

prevent us from being able to consider this issue on appeal.

Although the individual reports from the group exhibit at the dispositional hearing were not included in the record on appeal, the transcript of the hearing provides sufficient information on the services completed by the parents. The doctor who performed a psychological evaluation of B.M.-B. testified, as did the therapist who conducted N.B., Sr.'s initial sex offender assessment. The DCFS caseworker also testified at length about the services completed by both parents. Any doubts arising from the lack of the actual reports will be resolved in favor of the appellee.

We find there is sufficient information in the record for this court to decide the issues involved in this appeal.


A. Adjudicatory Order

Following the filing of a petition for wardship by the State and the placement of children in temporary custody, a circuit court will conduct an adjudicatory hearing to determine whether the allegations of the petition that the minors are abused, neglected or dependent are supported by a preponderance of the evidence. 705 ILCS 405/1-3 (West 2006). "Preponderance of the evidence is that amount of evidence that leads a trier of fact to find that the fact at issue is more probable than not." *In re K.G.*, 288 Ill. App. 3d 728, 735, 682 N.E.2d 95, 99 (1997). The best interest of the child is the paramount consideration for the circuit court. *In re Arthur H.*, 212 Ill. 2d 441, 464, 819 N.E.2d 734, 747 (2004).

On review, we will not disturb the circuit court's findings regarding abuse and neglect

15

1-08-0898 and 1-08-0900 (consolidated)

unless the findings are against the manifest weight of the evidence. *In re M.D.H.*, 297 Ill. App. 3d 181, 190, 697 N.E.2d 417, 423 (1998). A finding is against the manifest weight of the evidence "only if the opposite conclusion is clearly evident or if the determination is unreasonable, arbitrary, and not based on the evidence." *In re Tiffany M.*, 353 Ill. App. 3d 883, 890, 819 N.E.2d 813, 819 (2004).

An abused minor includes any minor under 18 years of age whose parent or any individual residing in the same home as the minor either (1) creates a substantial risk of physical injury to such minor by other than accidental means which would be likely to cause death, disfigurement, impairment of emotional health, or loss or impairment of any bodily function, or (2) commits or allows to be committed any sex offense against such minor. 705 ILCS 405/2-3(2)(ii)(iii) (West 2006).

A neglected minor includes any minor under 18 years of age whose environment is injurious to his or her welfare. 705 ILCS 405/2--3(1)(b) (West 2006). Neglect is defined as the failure to exercise the care that circumstances justly demand and encompasses both willful and unintentional disregard of parental duty. *In re Arthur H.*, 212 Ill. 2d at 463, 819 N.E.2d at 746. The term is not one of fixed and measured meaning, and it takes its content from the specific circumstances of each case. *In re Arthur H.*, 212 Ill. 2d at 463, 819 N.E.2d at 746. An injurious environment is an amorphous concept that cannot be defined with particularity but has been interpreted to include the breach of a parent's duty to ensure a safe and nurturing shelter for his or her children. *In re Arthur H.*, 212 Ill. 2d at 463, 819 N.E.2d at 746-47.

The public guardian initially contends that the doctrine of *res judicata* bars B.M.-B. from

16

challenging the juvenile court's adjudicatory finding that D.W., V.R., and N.B., Jr., were abused and neglected. The guardian argues that because B.M.-B. previously appealed the adjudicatory finding with respect to E.M. and this court issued a final ruling in that appeal, the mother cannot appeal the same finding with respect to D.W., V.R., and N.B., Jr. We disagree.

Three requirements must be satisfied for *res judicata* to apply: (1) a final judgment on the merits has been rendered by a court of competent jurisdiction; (2) an identity of cause of action exists; and (3) the parties or their privies are identical in both actions. *Hudson v. City of Chicago*, 228 Ill. 2d 462, 467, 889 N.E.2d 210, 213 (2008). The previous appeal involved one of the minors, E.M., while the instant appeal involves the remaining three minors, D.W., V.R., and N.B., Jr. The parties are not identical in both actions and therefore, *res judicata* does not apply.

We now turn to the issue of whether the trial court's finding that the minors were abused and neglected was against the manifest weight of the evidence. Parents-respondents contend that V.R.'s testimony was not credible because it was inconsistent and contradictory and she had two motives to lie. They further contend that the balance of evidence is in their favor because N.B., Sr., denied the sexual abuse allegations under oath and B.M.-B.'s testimony that she attempted to verify the allegations was credible and sincere. After a careful review of the record, we have determined that the trial court's finding that the minors were abused and neglected was not against the manifest weight of the evidence.

It is well settled that the trial court, having observed the witnesses and heard their testimony, is in the best position to make credibility determinations. *In re Z.R.*, 274 Ill. App. 3d 422, 427, 654 N.E.2d 255, 259 (1995); *In re S.M.*, 171 Ill. App. 3d 361, 365, 525 N.E.2d 565,

1-08-0898 and 1-08-0900 (consolidated)

568 (1988). Moreover, "[i]n cases involving the credibility of children who testify as to sexual abuse, the trial court must have broad discretion to reach a just determination, and a finding of abuse by the trial court is entitled to great deference." *In re Carlenn H.*, 186 Ill. App. 3d 535, 539-40, 542 N.E.2d 959, 961 (1989).

The trial court found V.R. to be a very credible witness, in contrast with its findings that the mother was simply not credible. The court noted that it watched and listened carefully to V.R.'s testimony, and contrasted her expression and demeanor with her mother's demeanor and contradictory explanations. The court noted that V.R. acknowledged when she lied and explained why she had done so, and it found that the explanations for changes in V.R.'s testimony were credible.

Although there were a number of times when V.R. said she simply could not recall, the trial court noted that she remembered where she lived and gave detailed descriptions of the games, the oral sex and semen. The court acknowledged that there were contradictions between some of the things V.R. said in the VSI and what she said in court, but found her overall testimony to be credible.

In contrast, the trial court found that B.M.-B. was not credible. The mother testified that she took V.R. to the doctor a week after her second outcry. She also testified that she had taken V.R. to the doctor in March 2006 to follow up on the first disclosure that was made in March 2005. However, the court noted that the only medical records for that period were for a May 2006 visit for a school physical that contained no mention of possible sexual abuse.

The court found that V.R. had been repeatedly sexually abused by her stepfather, and that

18

her mother ignored the allegations except to the extent that she confronted the stepfather and accepted his denial. The only other action taken by the mother was to tell V.R. to say nothing about the abuse when DCFS came to the house to interview her.

The court found that the remaining minors were abused and neglected because their mother failed to protect them from being hit and because they continued to live in a home where there were threats of violence and corporal punishment. The court further found them to be abused and neglected because they lived in a home in which their sibling had been sexually abused for two to three years and their mother remained in denial about the abuse.

We have examined the record and do not find the trial court's adjudicatory findings to be against the manifest weight of the evidence. Even if some of the details varied, V.R. consistently described games that her stepfather made up and forced her to play, and described things that a child her age would not be expected to know unless she had experienced them. Parents-respondents contend that V.R. could have learned these things from watching her parents' pornographic movies on her own without their permission. However, the record does not support this argument.

V.R. stated in the VSI that when her stepfather's semen went in her mouth, it tasted nasty and she spit it out. She also testified that when her stepfather tried to put both his penis and his finger in her vagina, it hurt. These are not things she would learn from simply watching an adult pornographic movie. Moreover, B.M.-B. told Dr. Sifferman that when V.R. disclosed the abuse the second time, she wondered how V.R. would know some of the things she was describing and that is why she decided to take her to the doctor. B.M.-B. testified that she found a pornographic

19

movie in D.W.'s possession shortly before the DCFS investigation, but acknowledged that none of the games V.R. described were on the movie.

Parents-respondents also contend that V.R. had two motives to lie. First, parents-respondents argue that V.R. lied because she wanted to live with her father's relatives who had given her a cell phone and a computer. Second, parents-respondents argue that V.R. lied initially to get herself out of trouble when her mother accused her of stealing her stepfather's money. We find these arguments unpersuasive.

The record shows that at the time of V.R.'s first disclosure to her mother, her abuser was in jail and therefore out of the house, explaining the timing of the disclosure. In addition, the disclosure was not made at the time V.R. was accused of stealing money, but rather the following day. Moreover, she had already disclosed the abuse to D.W. prior to the incident with the missing money, and had been encouraged by D.W. to tell her mother.

The record also shows that V.R. was experiencing feelings of guilt because she felt responsible for having split up the family, and the caseworker expressed concern that the guilt could cause her to recant. All of the siblings, including V.R., were having a difficult time because of their separation from one another. The record discloses that at one point, V.R. and D.W. even hatched a bizarre plot to kill their stepfather so that the family could be together again. The evidence in the record does not support a conclusion that V.R. would rather live with her father's relatives and away from her siblings.

Finally, parents-respondents contend that B.M.-B.'s testimony was credible and sincere and that she made sincere efforts to verify the abuse. We disagree. B.M.-B. testified that she

20

first took V.R. to the doctor in March of 2006, a full year after the first disclosure. She further testified that her efforts to verify the abuse merely involved questioning her husband and accepting his denial, and following the two of them around the house to see if they acted differently around each other.

B.M.-B. said that she took V.R. to the doctor again one week after the second disclosure. She testified that the second disclosure took place at the Cottage Grove residence, and had to have been in June 2006 because that is when the family moved to that residence. Although the mother contradicted herself on cross-examination and said the second disclosure happened in March 2006, the June 2006 date is consistent with both B.M.-B.'s and V.R.'s testimony that the second disclosure was made when the family lived on Cottage Grove.

As the trial court noted, the medical records provided for V.R. do not show any evidence of a visit in March 2006. There are no records for a visit in June 2006. There are records for May 2006 but they indicate V.R. was taken for a routine school physical and there is no mention of sexual abuse allegations. Indeed, there is no mention of sexual abuse allegations in any of the medical records provided until DCFS intervened and V.R. was examined by Dr. Sifferman. B.M.-B. never called the police, did not take V.R. to the emergency room, and did not seek any type of assistance or counseling for V.R.

As for the remaining minors, the trial court's finding was not against the manifest weight of the evidence. In making its determination, a trial court may consider evidence of the abuse or neglect of another minor. See 705 ILCS 405/2--18(3) (West 2006); *In re A.D.W.*, 278 Ill. App. 3d 476, 482, 663 N.E.2d 58, 62 (1996). In addition to the prolonged sexual abuse of a sibling,

21

the record discloses incidents of physical violence toward D.W. and threats of physical violence to both V.R. and D.W. "Where an injurious environment has been found to exist, the trial court need not wait until the child becomes a victim or is emotionally damaged permanently in order to remove the child from the household." *In re T.B.*, 215 Ill. App. 3d 1059, 1062-63, 574 N.E.2d 893, 896 (1991).

For the foregoing reasons, we hold that the trial court's ruling that the minors were abused and neglected is not against the manifest weight of the evidence.

### B. Dispositional Order

After a minor has been found to be neglected or abused, a dispositional hearing must be held for the trial court to determine whether it is in the best interest of the minor and the public to make the minor a ward of the court, and if so, to determine the proper disposition best serving the health, safety, and interests of the minor and the public. 705 ILCS 405/2--22(1) (West 2006). A minor may be made a ward of the court if the court determines that the parents are unable, for some reason other than financial circumstances alone, to care for, protect, train or discipline the minor. 705 ILCS 405/2--27(1) (West 2006).

The circuit court's finding that the parents are unable to care for, protect, train or discipline their children must be supported by a preponderance of the evidence. *In re Christopher S.*, 364 Ill. App. 3d 76, 89, 845 N.E.2d 830, 841 (2006). "Preponderance of the evidence is that amount of evidence that leads a trier of fact to find that the fact at issue is more probable than not." *In re K.G.*, 288 Ill. App. 3d at 735, 682 N.E.2d at 99. The best interest of the child is the paramount consideration for the circuit court. *In re Arthur H.*, 212 Ill. 2d at 464, 819

1-08-0898 and 1-08-0900 (consolidated)

N.E.2d at 746.

On review, we will not disturb the circuit court's dispositional findings unless they are against the manifest weight of the evidence. *In re T.B.*, 215 Ill. App. 3d 1059, 1062, 574 N.E.2d 893, 896 (1991). A finding is against the manifest weight of the evidence "only if the opposite conclusion is clearly evident or if the determination is unreasonable, arbitrary, and not based on the evidence." *In re Tiffany M.*, 353 Ill. App. 3d at 890, 819 N.E.2d at 820.

Parents-respondents contend that the trial court's finding was against the manifest weight of the evidence because B.M.-B. completed every service DCFS requested with the exception of individual therapy, the termination of which was not at her instigation. Parents-respondents further contend that the results of both B.M.-B.'s and N.B., Sr.'s psychological examinations were extremely favorable and that the trial court exhibited personal bias in favor of V.R. We disagree.

The trial court found B.M.-B. unable to care for her children because she had not yet addressed the issues that brought this case to DCFS. Her individual therapy was discontinued because she was unable to accept that V.R. was sexually abused by N.B., Sr. She was unable to protect her children because she continued to reside with N.B., Sr., and she continued to put his needs ahead of the needs of her children. The trial court found N.B., Sr., unable to care for his son because he had not addressed the sexual abuse or the domestic violence issues.

Based on our review of the record, the trial court's finding was not against the manifest weight of the evidence. The record shows that N.B., Sr., did not complete the sexual perpetrator assessment. The therapist testified that she would have administered a different assessment if

23

she had known of the trial court's finding of sexual abuse, so it was not unreasonable for DCFS to request an additional assessment. N.B., Sr., was also sporadic in his attendance at the required domestic violence classes and did not attend individual therapy consistently.

B.M.-B. complied with the majority of the DCFS requests. However, her individual therapy was discontinued because she was not making progress on the primary issue of acknowledging her daughter's abuse. V.R.'s therapist determined that she should no longer have unsupervised visits with her mother because of the psychological and emotional problems caused by her mother's continued denial of her abuse. D.W. and V.R. both stated that they did not wish to visit with their mother.

Dr. Heller's psychological evaluation of B.M.-B. was favorable overall, but he acknowledged that his evaluation was based on the best interests of the mother, while the trial court correctly stated that its standard is the best interests of the children. Dr. Heller also noted that B.M.-B. needs to accept the limitation that she cannot allow N.B., Sr., to have unsupervised access to her children, and the trial court observed that despite this, she continues to reside with N.B., Sr. While stating that B.M.-B. has the capacity to make the right choices in protecting her children from harm, Dr. Heller could not say that she would always choose to do so.

Parents-respondents rely primarily on *In re F.S.*, 322 Ill. App. 3d 486, 749 N.E.2d 1033 (2001). We find this reliance misplaced. In *In re F.S.*, this court held that the mother had made reasonable progress toward correcting the conditions that led to the removal of the minor. *In re F.S.*, 322 Ill. App. 3d at 493, 749 N.E.2d at 1039. One of the conditions leading to the removal was the mother's drug addiction, and this court found her successful participation in a drug

treatment program constituted reasonable progress even though the program was not approved by DCFS. *In re F.S.*, 322 Ill. App. 3d at 492-93, 749 N.E.2d at 1038-39. These facts are not analogous to the case at bar.

Here, the condition that led to the removal of the minors was the sexual abuse of V.R. by N.B., Sr. The parents have made no progress toward correcting this condition as both of them continue to deny the abuse occurred and B.M.-B. continues to reside with N.B., Sr. In addition, N.B., Sr., has made no progress toward addressing the domestic violence issues and has not yet completed a sexual perpetrator assessment. Moreover, B.M.-B.'s relationship with the two oldest minors has actually deteriorated because she continues to deny the abuse, to the point where V.R.'s therapist thinks it would be harmful for V.R. even to have unsupervised visits with her mother at this time.

Finally, we reject parents'-respondents' argument that the trial court displayed personal bias toward V.R. because the judge referred to V.R. during her testimony as "honey" and "sweetheart" and told her she was wonderful. The able and experienced trial court judge treated an eleven-year-old child who testified about sexual abuse as such a child should be treated by the court, regardless of the court's view on the issue of his or her credibility. The trial court gave a detailed and thorough explanation of its findings, including its credibility determinations, and its rulings were supported by the manifest weight of the evidence.

## III. CONCLUSION

We affirm the trial court's adjudicatory order that the minors were abused and neglected.

25

1-08-0898 and 1-08-0900 (consolidated)

We also affirm the trial court's dispositional order that the parents are unable, for some reason other than financial circumstances alone, to care for, protect, train or discipline the minors.

Affirmed.

O'BRIEN, P.J., and CAMPBELL, J., concur.

26

1-08-0898 and 1-08-0900 (consolidated)

REPORTER OF DECISIONS - ILLINOIS APPELLATE COURT
(Front Sheet to be Attached to Each case)

IN THE INTERESTS OF: D.W., V.R., and N.B., JR.,

Minors-Respondents-Appellees,

(PEOPLE OF THE STATE OF ILLINOIS,

Petitioner-Appellee,

v.

B.M.-B. and N.B., SR.,

Respondents-Appellants.)

No. 1-08-0898 and 1-08-0900 (consolidated)

Appellate Court of Illinois
First District, Fourth Division

October 30, 2008

JUSTICE GALLAGHER delivered the opinion of the court.

O'BRIEN, P.J., and CAMPBELL, J., concur.

Appeal from the Circuit Court of Cook County.

The Honorable Sandra Otaka, Judge Presiding.

For APPELLANTS, Cook County Public Defender, Chicago, IL (Elyse Krug Miller, of counsel) and Thomas J. Esler, Skokie, IL (Thomas J. Esler, of counsel)

For APPELLEE, Cook County State's Attorney, Chicago, IL (Richard A. Devine, James Fitzgerald, Nancy Kisicki, Grace E. Zaya, of counsel) and Cook County Public

27

1-08-0898 and 1-08-0900 (consolidated)

Guardian, Chicago, IL (Robert F. Harris, Kass A. Plain, Janet L. Barnes, of counsel)