**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2023 IL App (3d) 220932-U

Order filed March 15, 2023

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2023

| | | |
|---|---|---|
| *In re* E.R., | ) | Appeal from the Circuit Court |
| | ) | of the 9th Judicial Circuit, |
| a Minor | ) | Knox County, Illinois, |
| | ) | |
| (The People of the State of Illinois, | ) | |
| | ) | |
| Petitioner-Appellee, | ) | Appeal No. 4-22-0932 |
| | ) | Circuit No. 20-JA-55 |
| v. | ) | |
| | ) | |
| Jodi M., | ) | Honorable |
| | ) | Curtis S. Lane, |
| Respondent-Appellant). | ) | Judge, Presiding. |

_____

JUSTICE DAVENPORT delivered the judgment of the court.
Justices McDade and Hettel concurred in the judgment.

_____

**ORDER**

¶ 1    *Held*:   We affirm, concluding the trial court's unfitness and best-interests findings were
not against the manifest weight of the evidence.

¶ 2    Respondent, Jodi M., appeals from the trial court's order terminating her parental rights as

to her minor child, E.R., under the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS

405/1-1 *et seq.* (West 2020)).[1] She contends the court's findings that she was unfit and that terminating her parental rights was in E.R.'s best interests were against the manifest weight of the evidence. We disagree and affirm.

¶ 3                                I. BACKGROUND

¶ 4                    A. Adjudicatory and Dispositional Phase

¶ 5        On October 7, 2020, respondent gave birth to E.R., her third child and second with Jay R.[2] When respondent and E.R. were discharged from the hospital on October 10, 2020, the Department of Children and Family Services (DCFS) took protective custody of E.R. and placed her with her paternal aunt and uncle, who were already caring for E.R.'s siblings.

¶ 6        On October 13, 2020, the State petitioned for an adjudication of neglect as to E.R. In its petition, the State alleged E.R. was neglected based on an injurious environment (705 ILCS 405/2-3(1)(b) (West 2020)). Specifically, the State alleged (1) respondent had been found unfit in proceedings concerning her other minor children (Knox County case Nos. 19-JA-16 and 19-JA-17) and had not yet restored her fitness; (2) respondent had three indicated findings of neglect based on domestic-violence and substance-abuse issues; (3) domestic violence between respondent and Jay R. had increased since the birth of E.R.'s sibling in October 2018; (4) one of E.R.'s siblings had been struck at least once in a domestic-violence incident involving respondent and Jay R.; (5) respondent had obtained an order of protection against Jay R. but then allowed him to violate the order; and (6) respondent had tested positive for methamphetamine on three

---

[1] Respondent initiated her appeal in the Fourth District. On February 6, 2023, the supreme court, in the exercise of its administrative and supervisory authority, transferred the matter for decision to this district. Ill. S. Ct., M.R. 31650 (Feb. 6, 2023).

[2] Jay R. is not a party to this appeal.

occasions and failed to appear for drug tests on at least 23 occasions since September 2019. After a hearing, on January 5, 2021, the trial court found E.R. was neglected as alleged in the State's petition.

¶ 7 On February 2, 2021, the trial court entered a dispositional order, finding (1) respondent was unfit, for reasons other than financial circumstances alone, to care for, protect, train, educate supervise, or discipline E.R.; and (2) it was in E.R.'s best interests that she be placed in DCFS custody. The court determined the appropriate permanency goal was a return home within 12 months and ordered respondent to (1) cooperate with all tasks designated in DCFS's client service plan, (2) obtain and maintain a legal and verifiable source of income, (3) follow all recommendations for domestic-violence victim services, (4) complete a mental-health assessment and follow all recommendations, (5) maintain housing that meets minimal parenting standards, (6) complete a substance-abuse assessment and follow all recommendations, and (7) comply with all requested random drug screens.

¶ 8 B. Permanency Reviews

¶ 9 1. *August 17, 2021*

¶ 10 On August 17, 2021, the trial court conducted a permanency review. During the hearing, the court admitted several documents, including reports from the Center for Youth and Family Solutions (CYFS) and the Court Appointed Special Advocate (CASA), and heard testimony from Erica Baumgardner, a CYFS caseworker. The evidence established respondent had signed all necessary consents and regularly attended her weekly parent-child visits at the CYFS office in Galesburg. But, at the time of the hearing, she had failed to maintain contact with CYFS, allow CYFS access to her home, maintain a substance-free lifestyle, and failed to complete most of her recommended services.

3

¶ 11     Respondent successfully completed "domestic violence survivor's sessions" at Safe Harbor in March 2020. (She began those classes after the State commenced the proceedings involving E.R.'s older siblings.) However, while she was completing those services, she became pregnant with Jay R.'s child, E.R. Respondent remained in contact with her provider for support after she completed the sessions. But she refused Safe Harbor's recommendation to obtain an order of protection against Jay R., citing fear of violent retaliation. According to Baumgardner, respondent had failed to demonstrate progress as a result of those services, because she refused to obtain an order of protection against Jay R. and had another child with him.

¶ 12     Respondent was involuntarily discharged from substance abuse treatment in January 2021, due to her failure to attend. Respondent tested positive for methamphetamines on February 23, 2021, and March 16, 2021, and she failed to attend any of her random drug screens since that time. Respondent reported to CYFS that, in August 2021, she had completed a new substance-abuse assessment through the county health department, and the health department recommended she receive "extensive outpatient treatment."

¶ 13     Respondent was engaged in individual counseling at CYFS. Her therapist, had expressed concerns that she was "regressing substantially in her sessions and had attendance issues." The therapist reported respondent had trouble accepting responsibilities for her actions. The therapist planned to discharge respondent because she believed respondent needed more intensive counseling than she could provide. The therapist had worked with respondent for two years and observed a pattern in which respondent would briefly progress but then regress.

¶ 14     Respondent reported living in an apartment in Galesburg. In January 2021, a previous caseworker was twice scheduled to visit the apartment to observe it and complete a "Home Safety Checklist." However, respondent rescheduled both visits and later "continue[d] to cancel home

4

visits." In early August 2021, respondent reported obtaining employment as an in-home caregiver, but CYFS was unable to verify her employment at the time of the hearing. Respondent frequently changed her phone number and had "no call[ed]/no show[ed] *** many scheduled appointments" with CYFS and her service providers.

¶ 15 Because only six months had passed since the dispositional order, Baumgardner recommended the permanency goal not be changed. The trial court found respondent had not made reasonable efforts or progress toward the return of E.R. but determined the goal should remain as return home within 12 months.

¶ 16                                    2. *January 13, 2022*

¶ 17 On January 13, 2022, the trial court conducted another permanency review hearing. The court again admitted several documents, including reports from CYFS and CASA. The court also heard testimony from respondent and Rene Pelotte, a CYFS caseworker assigned to the case in early November 2021.

¶ 18 The evidence established respondent had signed all necessary consents and continued to regularly attend her once-weekly parent-child visits with E.R. Since the previous permanency hearing, respondent had been referred for mental-health services at Bridgeway. Respondent reportedly attended one session but CYFS had no documentation reflecting her attendance or engagement. Respondent reported that, after her August 2021 substance-abuse assessment, she engaged in substance-abuse treatment at Bridgeway and had attended one visit. She admitted to using methamphetamines in July 2021 and failed to attend any random drug screens since August

27, 2021.[3] CYFS made efforts to visit respondent's apartment, but respondent canceled at least two scheduled appointments. Most recently, Pelotte scheduled a visit for December 6, 2021. After respondent failed to respond to text messages to confirm a time, the caseworker attempted to visit respondent but was unable to make contact with her. Respondent later told the caseworker she had forgotten about the appointment and was meeting with her attorney at the time. Respondent reported she had been offered employment in July 2021 but the offer had since been rescinded. (It is not clear whether the July 2021 offer was for the in-home caregiving services referenced in the reports admitted at the August 2021 permanency hearing.)

¶ 19        Respondent testified that, since the last permanency hearing, she worked for about two weeks at a fast-food restaurant. However, because she was only offered 20 hours per week, she sought employment at NAEIR through a temp agency. She was scheduled to begin work there later in January 2022. At the time of the hearing, respondent had been engaged with a drug counselor at Bridgeway twice a week for "well over a month, a month and a half." She also attended Narcotics Anonymous meetings. Respondent was performing regular drug screens at Bridgeway, and she was not using any substances. The most recent screen was "an instant test" which came back negative. Respondent did not know the results of the other screens. Respondent confirmed she was referred to Bridgeway for mental-health treatment but was placed on a three-month waiting list. Thus, she planned to seek treatment through the county health department.

¶ 20        Respondent testified she had not seen Jay R. in approximately six months. She visited with E.R. every Tuesday for three hours. She explained she had been late to recent visits because she

_____

[3] Evidence admitted at a later permanency-review hearing established that respondent did, in fact, comply with four random drug screens in November and December 2021 and three times tested positive for methamphetamines.

relied on a bicycle for transportation and was coming from appointments at Bridgeway, which was "way on the edge of Galesburg."

¶ 21　　The trial court found respondent had not made reasonable efforts or progress and entered an order changing the permanency goal to substitute care pending the determination of parental rights.

¶ 22　　　　　　　　　　　　C. Termination Phase

¶ 23　　　　　　　　　　　　1. *The State's Petition*

¶ 24　　On January 24, 2022, the State petitioned to terminate respondent's parental rights, which it later twice amended. In its second amended petition, the State alleged respondent was unfit, in part, because between September 28, 2021, and June 28, 2022, she failed to make (1) reasonable efforts to correct the conditions which were the basis for E.R.'s removal (750 ILCS 50/1(D)(m)(i) (West 2020)); and (2) reasonable progress toward the return of E.R. (*id.* § 1(D)(m)(ii)). The State further alleged it was in E.R.'s best interests that respondent's parental rights be terminated.

¶ 25　　　　　　　　　　　　2. *Fitness Hearing*

¶ 26　　On August 30, 2022, the trial court conducted a fitness hearing. The State presented the testimony of Cecily Dorsett, Rene Pelotte, and Stephanie Brockett. Respondent also testified. The trial court later stated it did not consider Dorsett's testimony in reaching its decision; thus, we omit from our account her testimony.

¶ 27　　The evidence established respondent was required to verify that she had income and housing, comply with random drug screens, and cooperate with CYFS. She was also required to complete a substance-abuse assessment and follow any recommendations, engage in mental-health services, and integrate into her daily life the lessons from her previously completed domestic-violence services.

7

¶ 28                                    a. Pelotte

¶ 29        Pelotte was E.R.'s caseworker between November 1, 2021, and January 24, 2022. According to Pelotte, respondent did not "do any mental health services" during those three months. Respondent failed to appear for drug screens on November 15, November 23, December 6, and December 15. Respondent reported that she had an apartment but CYFS was not able to verify. Pelotte testified respondent agreed to allow her to visit respondent's apartment, but when Pelotte arrived, respondent was not home. Respondent did not have any in-home parent-child visits with E.R. during that time period.

¶ 30                                    b. Brockett

¶ 31        Brockett was Pelotte's supervisor from November 1, 2021, to January 24, 2022. She took over as E.R.'s caseworker from January 24, 2022, to April 2022, and then supervised E.R.'s caseworker beginning in May 2022. Brockett testified CYFS was never able to verify respondent had adequate housing or obtained employment. On May 17, 2022, respondent made a threat of self-harm to E.R.'s foster parent. CYFS attempted to contact respondent but respondent did not respond to phone calls or texts. The next day, Brockett went to respondent's apartment to check on her. Brockett knocked on and saw movement under the door, but respondent did not answer.

¶ 32        With respect to respondent's substance abuse, Brockett testified respondent attended an assessment but was discharged when she failed to complete it. Respondent reported in February 2022 that she was engaged in services at Bridgeway and was being screened. CYFS received records from Bridgeway, which indicated respondent had positive drug tests in November and December 2021, had a single clean screen in December 2021, and gave a sample, on January 24, 2022, "that was unsuitable for testing due to *** protein levels in the urine," suggesting the sample had been tampered with.

8

¶ 33     Respondent began mental-health services at Bridgeway but, to the agency's knowledge, did not complete the assessment or participate in any mental-health treatment.

¶ 34     According to Brockett, respondent "sometimes" cooperated with CYFS. She explained respondent attended visits with E.R., at which time CYFS could speak with respondent. However, Brockett had scheduled meetings with respondent at her apartment that fell through. Thus, Brockett scheduled a meeting with respondent at the CYFS office. On the morning of the meeting, respondent called and said "her ride didn't come through." They met briefly over the phone, but respondent became upset and ended the call.

¶ 35                                        c. Respondent

¶ 36     Respondent testified she had lived in the same apartment in Galesburg for more than two years. Since January 2021, she had been generally unemployed, except she worked at a fast-food restaurant for about a week and worked as a caretaker for an older man with whom she was friends. (Respondent did not specify when she worked these jobs or how long she worked as a caretaker.) Most recently, beginning in June or July 2022, respondent worked at Dick Blick, where she was still employed at the time of the hearing.

¶ 37     Respondent completed a domestic-violence course through Safe Harbor in 2020. At some point before the hearing, she had engaged in substance-abuse treatment at Bridgeway. She explained Bridgeway had changed her counselor to one with whom she previously was engaged and with whom she did not "click." She did not request a new counselor and was discharged when she missed her first appointment.

¶ 38     Respondent acknowledged she had not completed any mental-health treatment. She explained that, at the direction of an old caseworker, she sought and obtained an assessment at the health department, with the plan of receiving treatment and counseling at Bridgeway. When she

9

returned to Bridgeway, however, she was placed on a six-month waiting list. About two months before the hearing, she sought treatment at the health department. According to respondent, had she sought treatment originally at the health department and not Bridgeway, she would have been much further along in her treatment.

¶ 39                                    d. The Trial Court's Findings

¶ 40        The trial court found respondent unfit based on her failure, between September 28, 2021, and June 28, 2022, to make (1) reasonable efforts to correct the conditions that brought E.R. into care and (2) reasonable progress toward the return of E.R.

¶ 41                                    4. *Best-Interests Hearing*

¶ 42        On September 29, 2022, the trial court conducted a best-interests hearing. Respondent failed to appear.

¶ 43        The trial court admitted reports from CYFS and CASA and heard testimony from Sarah Decker, a CYFS caseworker who was currently assigned to E.R.'s case. The evidence showed E.R. was now almost two years old and was doing well in her foster home, where she had been since her discharge from the hospital three days after her birth. She was well-bonded with her foster parents and referred to them as "mom" and "dad." E.R. cried when the foster mother dropped her off for her visits with respondent but calmed down when the foster mother assured E.R. that she would be back. She was also well-bonded with her foster and biological siblings that lived with her in the foster home. E.R. appeared to be safe, secure, and comfortable in the foster home. She was "current with medical" and was a "very happy, busy little girl." The foster parents had completed adoption classes, were willing to provide her with permanency, and were excited and eager to soon adopt E.R. and her siblings.

10

¶ 44 Respondent was still attending visits, though they had been reduced to three hours every two weeks. Respondent agreed to allow CASA to visit her apartment but never contacted CASA to schedule an appointment. CASA made three attempts to set up a visit, calling both cell phone numbers respondent had provided, but respondent ignored those attempts.

¶ 45 E.R. "struggle[d] to listen to [respondent] at times during visits, and in response [respondent would] often let [E.R.] have her way instead of sticking with the boundaries she establishe[d]." Respondent was "able to focus on [E.R.] intermittently but struggle[d] to remain focused *** when she [was] feeling angry about her case." During visits, respondent spent "significant time expressing her discontentment about her case to the visit supervisor instead of focusing her attention on [E.R.]"

¶ 46 Decker opined it was in E.R.'s best interests to terminate respondent's parental rights. She based her opinion on respondent's inability to meet E.R.'s basic needs for health, safety, education, and well-being. By contrast, the foster parents had met all of E.R.'s needs since birth. E.R. displayed attachment to the foster parents and her siblings; her "sense of security and familiarity [lay] with her foster family."

¶ 47 After hearing arguments, the trial court terminated respondent's parental rights, finding it was in E.R.'s best interests to do so.

¶ 48 This appeal followed.

¶ 49 II. ANALYSIS

¶ 50 On appeal, respondent contends the trial court's fitness and best-interests findings were against the manifest weight of the evidence.

¶ 51 A. Proceedings to Terminate Parental Rights

11

¶ 52    Proceedings to terminate parental rights are principally governed by the Juvenile Court Act and the Adoption Act (750 ILCS 5/1 *et seq.* (West 2020)) and consist of two phases. *In re Deandre D.*, 405 Ill. App. 3d 945, 952 (2010). First, the State must prove by clear and convincing evidence the parent is unfit on any one of the grounds listed in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2020)). *Deandre D.*, 405 Ill. App. 3d at 952. Second, if the court finds the parent is unfit, the State must prove by a preponderance of the evidence that termination of the parent's rights is in the minor's best interests. *Id.* at 953.

¶ 53    We will not disturb the trial court's unfitness or best-interests findings unless they are against the manifest weight of the evidence. *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064, 1072 (2006). A finding is against the manifest weight of the evidence when it is unreasonable. *In re D.W.*, 386 Ill. App. 3d 124, 139 (2008).

¶ 54                        B. Unfitness Finding

¶ 55    The trial court found the State proved respondent was unfit on two grounds: her failure to make (1) reasonable efforts to correct the conditions that brought E.R. into care (750 ILCS 50/1(D)(m)(i) (West 2020)) and (2) reasonable progress toward the return of E.R. (*id.* § 1(D)(m)(ii)). Because the grounds for finding unfitness under the Adoption Act are independent, we may affirm the trial court's judgment if the evidence supports any one of the grounds alleged. *In re B'Yata I.*, 2014 IL App (2d) 130558-B, ¶ 30.

¶ 56    We conclude the trial court's finding that respondent failed to make reasonable progress toward the return of E.R. during the nine-month period between September 28, 2021, and June 28, 2022, was not against the manifest weight of the evidence. Reasonable progress is an objective standard that requires, at a minimum, "measurable or demonstrable movement" toward reunification. *Daphnie E.*, 368 Ill. App. 3d at 1067. "Reasonable progress exists when the trial

12

court can conclude that it will be able to order the child returned to parental custody in the near future." *Id.*

¶ 57 The evidence established respondent was required to verify that she had income and housing, comply with random drug screens, and cooperate with CYFS. She was also required to complete a substance-abuse assessment and follow any recommendations, engage in mental-health services, and integrate into her daily life the lessons from her previously completed domestic-violence services.

¶ 58 At the fitness hearing, the State presented evidence that respondent had made no progress in regard to her mental-health or substance-abuse issues. Admittedly, respondent participated in mental-health and substance-abuse assessments during the relevant time period, but she failed to actually engage in treatment. And while she made some effort to engage in mental-health services, by her own admission, she could have been much further along in her treatment at the time of the hearing. Further, respondent chose not to engage in substance-abuse treatment, terminating the services because she did not "click" with her provider. Instead, she continued to use drugs, testing positive for drugs on three occasions in November and December 2021.

¶ 59 We acknowledge that Brockett testified respondent "sometimes" cooperated with CYFS. But, as a whole, the evidence established that respondent's cooperation with CYFS was poor. Though respondent reported she lived in the same apartment for more than a year, CYFS was never able to verify that fact. Despite multiple attempts and scheduled appointments, respondent did not once allow CYFS to enter her apartment to assess its safety and suitability for a young child. Respondent also failed to communicate with CYFS unless she was present in the CYFS office for her parent-child visits. She failed to return phone calls, failed to attend an in-person meeting with Brockett, and terminated a telephone meeting when she became upset.

13

¶ 60 Additionally, respondent failed to obtain and maintain adequate employment throughout much of the nine-month period. She testified she had been generally unemployed since January 2021, except for two brief periods of employment at a fast-food restaurant and as an in-home caregiver for a friend. She never provided any verification of these jobs to CYFS. It was not until the very end of the nine-month period at issue that respondent obtained stable employment.

¶ 61 Respondent nevertheless argues she made measurable movement toward the goal of reunification. She notes she completed domestic-violence services "in a satisfactory manner many months prior and no service plan or testimony evidences any further recommended classes to address domestic[-]violence concerns." She also points out that she "rarely, if ever, missed a visit" with E.R., "had consistent, safe, and stable housing," had obtained employment, and was engaged with a mental-health counselor. Based on this evidence, respondent asserts, the trial court should not have found she failed to make reasonable progress toward reunification. We disagree.

¶ 62 Admittedly, respondent satisfactorily completed a domestic-violence victim class. However, that class was completed well before the nine-month period at issue, and we fail to see how that demonstrates reasonable progress *during the relevant timeframe*. Moreover, the record shows that, while respondent was enrolled in domestic-violence services, she continued her involvement with her abuser, Jay R., had a child with him after she completed those classes, and had contact with him well into 2021. Given her continued contact with her abuser, the trial court could properly find she failed to implement into her life what she learned in the classes.

¶ 63 Further, we reject respondent's assertion that she had "consistent, safe, and stable housing." We appreciate that respondent reportedly lived in the same apartment throughout much of this case, which supports her assertion that her housing was consistent and stable. But despite multiple

14

opportunities, she never permitted CYFS to enter the apartment to determine whether it was safe or suitable for E.R. Thus, the safety of her home was never evaluated or verified.

¶ 64 We likewise reject respondent's argument that she demonstrated reasonable progress toward addressing her mental-health concerns and achieving stable employment during the nine-month period at issue. To be sure, respondent testified she had reengaged in mental-health treatment at the county health department about two months before the fitness hearing, *i.e.*, in June 2022. In the same vein, she testified she obtained employment at Dick Blick about two months before the fitness hearing, in June or July 2022. However, the record establishes she engaged in no mental-health treatment and was unemployed during a large portion of the nine-month period. She did not engage in treatment or obtain the job at Dick Blick until the very end of that period. See *In re A.P.*, 277 Ill. App. 3d 592, 599 (1996) ("A recent 'flurry of activity' regarding [the respondent's] goals immediately prior to the *** hearing on the petition *** can hardly overcome several months where her efforts were minimal at best."). Respondent's delay undercut her ability to establish she made "measurable or demonstrable movement" toward reunification. See *Daphnie E.*, 368 Ill. App. 3d at 1067.

¶ 65 We acknowledge respondent regularly attended her weekly, supervised parent-child visits at the CYFS office. We do not disagree that respondent's efforts in this regard were laudable. However, efforts should not be confused with progress. See *In re R.L.*, 352 Ill. App. 3d 985, 999 (2004). Here, respondent never progressed from weekly supervised visits to more frequent or in-home, unsupervised visits and failed to demonstrate her ability to independently parent E.R.

¶ 66 Simply put, we agree with the trial court's finding that, at the time of the fitness hearing, E.R. was no closer to returning home than she was at the inception of the case, almost two years earlier. Respondent made little, if any, progress during the relevant time period. Accordingly, we

15

conclude the trial court's finding that respondent was unfit based on her failure to make reasonable progress was not against the manifest weight of the evidence. In light of our conclusion, we need not determine whether the State also proved she failed to make reasonable efforts. See *B'Yata I.*, 2014 IL App (2d) 130558-B, ¶ 30.

¶ 67                                C. Best-Interests Finding

¶ 68        The trial court's focus at the best-interests stage is the child's welfare and whether termination would improve the child's future financial, social, and emotional atmosphere. *In re D.M.*, 336 Ill. App. 3d 766, 772 (2002). "[A]t a best[-]interests hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *In re D.T.*, 212 Ill. 2d 347, 364 (2004). When making a best-interests determination, the court must consider the following factors: (1) the physical safety and welfare of the child; (2) the development of the child's identity; (3) the child's background and ties; (4) the child's sense of attachment, including where the child feels love, attachment, and security; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's needs for permanence, including the need for stability and continuity of relationships with parent figures, siblings, and other relatives; (8) the uniqueness of every family and child; (9) the risks attendant to entering and being in substitute care; and (10) the preferences of the persons available to care for the child. 705 ILCS 405/1-3(4.05) (West 2020).

¶ 69        We conclude the trial court's finding that termination of respondent's parental rights was in E.R.'s best interests was not against the manifest weight of the evidence. The evidence presented at the best-interests hearing established E.R. was almost two years old and had been with her foster parents, her paternal aunt and uncle, since her discharge from the hospital three days after her birth. E.R. was thriving in her foster home and all of her needs were met. She was well-bonded with her

foster parents, referred to them as "mom" and "dad," and was also well-bonded with her foster and biological siblings that lived in the home.

¶ 70 Respondent was still attending visits, though they had been reduced to three hours every two weeks. E.R. cried when the foster mother dropped her off for her visits but calmed down when the foster mother assured E.R. that she would be back. E.R. appeared apprehensive toward respondent at the beginning of the visits but would eventually warm up. E.R. "struggle[d] to listen to [respondent] at times during visits, and in response [respondent would] often let [E.R.] have her way instead of sticking with the boundaries she establishe[d]." Respondent was "able to focus on [E.R.] intermittently but struggle[d] to remain focused *** when she [was] feeling angry about her case." During visits, respondent spent "significant time expressing her discontentment about her case to the visit supervisor instead of focusing her attention on [E.R.]"

¶ 71 E.R. appeared to be safe, secure, and comfortable in the foster home. She was "current with medical" and was a "very happy, busy little girl." The foster parents had completed adoption classes, were willing to provide her with permanency, and were excited and eager to soon adopt E.R. and her siblings.

¶ 72 Respondent nevertheless asserts she had remedied the conditions that brought E.R. into foster care. Thus, she argues, there exists no basis on which to terminate her parental rights. We disagree.

¶ 73 First, we note that, while we may consider a parent's conduct at the best-interests stage, our focus is primarily on the child. *In re T.A.*, 359 Ill. App. 3d 953, 959 (2005). Second, we reject respondent's assertion that she had remedied the conditions that brought E.R. into care. For the reasons discussed above, that assertion is simply not true.

17

¶ 74 In any event, the evidence overwhelmingly established that termination of respondent's parental rights was in E.R.'s best interests. Indeed, throughout E.R.'s entire life, her foster parents met each and every one of her needs and their home was the only home E.R. ever knew. The foster parents fully integrated E.R. into their family, treated her as their own, and were ready, willing, and able to provide permanency to E.R. Simply put, based on the evidence presented, the trial court correctly declined to prolong these proceedings for an indeterminate period of time so that respondent could demonstrate her ability to effectively parent E.R. Under these circumstances, we conclude the trial court's best-interests finding was not against the manifest weight of the evidence.

¶ 75 III. CONCLUSION

¶ 76 For the reasons stated, we affirm the judgment of the circuit court of Knox County.

¶ 77 Affirmed.