2021 IL App (2d) 200581-U
No. 2-20-0581
Order filed February 9, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* R.W., T.S., and S.J., Minors | ) | Appeal from the Circuit Court |
| | ) | of Winnebago County. |
| | ) | |
| | ) | Nos. 19-JA-40 |
| | ) | 19-JA-41 |
| | ) | 19-JA-42 |
| | ) | |
| (The People of the State of Illinois, Petitioner-Appellee, v. Lameka W., Respondent-Appellant). | ) | Honorable |
| | ) | Francis Martinez, |
| | ) | Judge, Presiding. |

JUSTICE JORGENSEN delivered the judgment of the court.
Justices Zenoff and Brennan concurred in the judgment.

**ORDER**

¶ 1   *Held*:  We grant appellate counsel leave to withdraw from mother's appeal concerning termination of her parental rights to two of her children.  As to the third child, the trial court's best-interests finding was not contrary to the manifest weight of the evidence.  We affirm.

¶ 2   Respondent, Lameka W., appeals from the trial court's order terminating her parental rights to her children, R.W., T.S., and S.J.[1]  Pursuant to *Anders v. California*, 386 U.S. 738 (1967),

_____

[1] The three minors have different fathers, but their parental rights are not at issue in this appeal.

respondent's appellate attorney moves to withdraw from respondent's appeal concerning R.W. and S.J. See *In re S.M.*, 314 Ill. App. 3d 682, 685 (2000) (*Anders* applies to termination cases). However, with respect to T.S., counsel argues that the court erred in its best-interest finding. We grant counsel leave to withdraw with respect to R.W. and S.J. As to T.S., we affirm.

¶ 3                                    I. BACKGROUND

¶ 4     On January 24, 2019, the State filed three neglect petitions, alleging that the minors were abused and/or neglected. The petition as to R.W. (born April 21, 2018), consisted of two counts of neglect, alleging that he was in an injurious environment because: (1) his parents engaged in domestic violence in his presence; and (2) his sibling, T.S., had injuries consistent with being stuck by a belt. The petitions as to T.S. (born May 8, 2013), and S.J. (born July 28, 2011), consisted of four counts of neglect, alleging that they were: (1) in an injurious environment because the parents engaged in domestic violence in their presence; (2) abused and physically injured when struck by a belt; (3) abused because they lived in an environment with a substantial risk of being physically injured by being struck by a belt; and (4) abused because they were the subjects of excessive corporal punishment.

¶ 5     Respondent waived the shelter care hearing and conceded that there was probable cause of neglect. The statement of facts alleged that the Department of Children and Family Services (DCFS) had responded to a hotline call from T.S.'s school. The school reporter had observed "horrendous" scarring, including torn-off skin, on T.S.'s back and extending from her armpits to her waist, consistent with being struck by a belt. The investigator also reported that, when interviewing S.J., S.J. reported that he was struck with a belt on his stomach and legs, and the investigator observed a mark on S.J.'s back. S.J. reported that T.S. was hit "all the time." Further, S.J. reported that he had witnessed four physical altercations between respondent and R.W.'s

father. When the investigator interviewed respondent, respondent stated that she knew about the marks on T.S.'s body, reporting that she "whips her with a belt as discipline." In addition, respondent confirmed that R.W.'s father "choke[s] [her] up," which she described as putting his hands around her neck, but she denied that it was anything serious. The court granted DCFS guardianship and custody, with discretion to allow respondent supervised visitation.

¶ 6    At an April 2, 2019, adjudicatory hearing, respondent stipulated to count II of the petitions, and the remaining counts of all three petitions were dismissed.

¶ 7    In an April 2019, assessment, respondent reported that the children fear R.W.'s father, who disciplines them by hitting them with a belt; yet, she continued to live with him. She reported that she, too, struck the children with a belt, and she did not acknowledge that disciplining children with a belt and leaving bruises was abusive. The assessment noted that, although collateral sources suggested that only R.W.'s father struck the children with belts, respondent insisted that she did too, and she remained protective of R.W.'s father. The report reflected that respondent was cooperative, but she did not understand why she was being "punished." At an April 24, 2019, dispositional hearing, respondent agreed that guardianship and custody of the minors would remain with DCFS with discretion to place them with a relative or traditional foster care. The court admonished that the parents had nine months from the date of disposition to make reasonable efforts and progress toward return of the minors. However, at a September 24, 2019, permanency hearing, the court learned that respondent had not engaged in required services, and it found that respondent had not made reasonable efforts.

¶ 8    On January 13, 2020, DCFS submitted to the court a service plan reflecting that respondent stopped attending personal counseling because she did not believe that it was helpful. The caseworker reported that respondent had said that she "does not understand why she is being

punished and her children were taken." Respondent reportedly was facing both eviction and a pending criminal case. Due to a variety of factors, including a placement change for the children, respondent last visited them in late December 2019. At a January 28, 2020, permanency hearing, respondent was not present, despite a reminder from the caseworker. The court found that respondent had not made reasonable efforts or progress and that "there just seems to be a great deal of instability in [respondent's] life. And I believe she's struggling mightly[,] but is simply not making the progress necessary nor the efforts that are necessary. I think she's trying her best[,] but it is not sufficient." The court changed the goal from return home to termination of parental rights.

¶ 9     On March 2, 2020, the State moved on four bases to terminate respondent's parental rights to the three children: (1) failure to demonstrate a reasonable degree of interest, concern, or responsibility for the minors' welfare (750 ILCS 50/1(D)(b) (West 2018)); (2) failure to protect the minors from an environment injurious to their welfare (750 ILCS 50/1(D)(g) (West 2018)); (3) failure to make reasonable efforts to the return of the children to her care from April 2, 2019, through January 2, 2020 (750 ILCS 50/1(D)(m)(i) (West 2018)); and (4) failure to make reasonable progress toward the return of the children to her care from April 2, 2019, through January 2, 2020 (750 ILCS 50/1(D)(m)(ii) (West 2018)).

¶ 10     The trial court held a fitness hearing on June 3, 2020. Respondent did not appear and had not been in contact with her attorney, but her caseworker stated that she believed that respondent had moved to Iowa. The court denied a motion to continue. Without objection, the court took judicial notice of the adjudicatory, dispositional, and permanency review orders. [2]

_____

[2] State exhibit Nos.1-4 were admitted into evidence without objection. Near the end of the

¶ 11    Stephanie Sanders, the DCFS caseworker, testified that she participated in the integrated assessment for the minors and respondent at the beginning of the case, and she laid foundation for the State's exhibits. In addition, Sanders testified to respondent's efforts and progress during the case. In sum, although respondent was asked to complete individual counseling, domestic violence counseling, a substance abuse assessment, and parenting classes, none were completed. She had not visited her children since late December 2019 and had never progressed to unsupervised visitation. No other evidence was offered by any party. On July 27, 2020, the court found that the State had met its burden of proof by clear and convincing evidence on all four counts as to all three minors. As to count II, in announcing its ruling, the court noted evidence to support that count was reflected in State exhibit No. 5 and, further, that it was unrebutted that respondent had admitted to using excessive corporal punishment.

¶ 12    On August 28, 2020, the trial court held a best-interests hearing. Respondent was not present. Her counsel reported that he had not heard from her and, later in the hearing, he informed the court that he had just learned that respondent was in jail. As such, Sanders was, again, the sole witness to testify. She, too, had not been in contact with respondent. Sanders testified that, since March 2019, R.W. had been in the same foster home placement, that she had personally observed him there, and that he was doing well and meeting all developmental milestones. Sanders testified that R.W. was bonded to his foster mother, called her "mama," considered himself part of the family, and that the foster family very clearly loved him and was willing to adopt him.

---

hearing, the State asked the court if it had admitted into evidence State exhibit No. 5 (the indicated packet), and the court responded that it had, although, technically, that exhibit had not been formally offered for admission.

¶ 13    As to S.J., Sanders testified that, due to anxiety from the physical abuse, he had been attending therapy.  Since January 2020, S.J. had been with his current foster placement; she had observed S.J. with the family, he seemed bonded with them, and she testified that he was "very acclimated to the family environment."  The foster family had involved S.J. in activities, such as swimming and basketball, and, when not in school, he was reading and learning cooking.  As he was diagnosed with attention deficit hyperactivity disorder (ADHD), the foster father tries to sit with him during online learning.  She further testified that the foster parents actively supported contact between the siblings, although meeting in person had become difficult during the COVID-19 pandemic.  Respondent had not seen S.J. since December 2019.  It was DCFS's opinion that it was in S.J.'s best interests that he remain in the foster home for adoption.

¶ 14    Regarding T.S., Sanders explained that, in March 2019, T.S. was removed from a relative placement, and her behaviors "have only increased in intensity."  Specifically, Sanders testified that T.S. has been diagnosed with ADHD and reactive attachment disorder (RAD) and, because it is "hard for her to attach to people," she tends to sabotage any attachment.  T.S. has had multiple placements.  She mentioned that T.S. had started referring to one foster parent as "mom," but that foster parent did not continue the placement; although that foster parent wished to arrange visitation with T.S., Sanders did not think that it would be in T.S.'s best interests, as it might give her "false hope."  T.S. is currently living at Lydia Home, a residential facility, because her behaviors are "very extreme."  According to Sanders, staff at Lydia House reported that T.S. was doing well, was quiet, and appeared to be in a "honeymoon stage," although she was having difficulty getting along with her peers. When asked about it, T.S. reported to Sanders that she had lied to her peers, and Sanders explained that she needed to make better choices.  Sanders further testified that T.S. "still asks for mom," later clarifying that, in August 2019, T.S. had asked about

her mom every "once and awhile." Although DCFS was actively looking for a placement into which T.S. could eventually transition, she was "not slated to be discharged from her residential facility." As there was no discharge date, there remained time to work on a placement into which T.S. could be moved.

¶ 15    Sanders testified that respondent was "very good" with the minors when she visited them, but that she had not visited them since December 2019. She agreed that respondent "has always maintained that she wanted to get her children returned to her care." When asked why DCFS believed that it was in T.S.'s best interests that respondent's rights be terminated, Sanders explained:

> "At this point both parents are [*sic*] pending charges in the Winnebago County Jail for physical abuse charges to these children. [T.S.] is still very sensitive when you bring up [R.W.'s father's] name and [respondent's] name. I know that she loves [respondent]; I know that [respondent] loves her. But at this point[,] [respondent] cannot provide a date of release or where she's going to be staying. [Respondent] was also residing in Carroll County—Carroll, Iowa; so that would attest to, if she wanted to get her children back, why she would move to another state[?] So the Department believes it's in her best interests to free her for adoption."

Sanders noted that respondent did not report having completed any services in Iowa, nor did she complete any services in Illinois.

¶ 16    At the conclusion of the hearing, respondent's counsel argued that it was not in T.S.'s best interests to terminate respondent's rights, where there was no realistic plan for an adoptive placement. The guardian *ad litem* disagreed, noting that T.S.'s behaviors in her foster home had been extreme and, accordingly:

"She needs to be in the placement that she's in right now.  It is the placement that is best for her and will hopefully get her to a place where she can be discharged to a pre-adoptive home.  She should not have to wait to know what her future goal is going to be just because she's not in that placement yet.

I think it's in her best interests to start to be processing the idea that she's not going back home and not to delay that simply because she's not in a pre-adoptive home.

I think [respondent's] lack of consistent contact and lack of engagement have expressed what [respondent's] desires are more than her words, and I think at this time it's best for [T.S.] that parents' rights be terminated."

¶ 17    The court found it in the best interests of all three minors that respondent's parental rights be terminated.  It noted that the prognosis for reunification with respondent was almost "nil," as she had not completed any services and that denial of the State's petition would only delay the inevitable, which would not be fair to the three children.

¶ 18    On August 31, 2020, respondent moved to re-open the proofs as to *only* best interests.  The court granted the motion and, on September 21, 2020, it heard additional evidence from respondent concerning best interests.  Respondent testified that she was concerned about the children's culture, as they are African-American, and that she wished that they could be raised by her family and not in Caucasian homes, where they might grow up thinking that things "are easier or different for them."  Respondent testified that her family really misses the children and loves them.  In addition, she testified to her love for the children, explaining that she wanted them to know how much she loves them, and that she would like a second chance.  "I love them so much.  They are my heart and joy.  And I don't want them growing up hating me."  She further testified that the criminal charges against her concerning abuse in this case had been reduced to misdemeanor battery,

because "[t]hey didn't find that I was really physically abusing my children." Respondent was sentenced to two years' probation, which she said she would serve in Illinois, and it provided that she have no contact with T.S., unless approved and supervised by DCFS. At the time of the hearing, she was staying in Illinois with a friend.

¶ 19 At the end of the hearing, the court again found that it was in the best interests of all three minors that respondent's parental rights be terminated. The court noted that respondent's primary concern involved culture, and that the reports and photo albums previously presented to the court somewhat addressed cultural integration from the foster parents. In addition, while respondent's statement was heartfelt and her feelings understandable, there was no indication that future reunification would be possible in any reasonable period. Respondent appeals.

¶ 20                                II. ANALYSIS

¶ 21 Proceedings to terminate parental rights are governed principally by the Juvenile Court Act of 1987 (the Act) (705 ILCS 405/1-1 *et seq.* (West 2018)) and the Adoption Act (750 ILCS 50/1 *et seq.* (West 2018)). The Act provides a two-step process for the involuntary termination of parental rights. *In re Deandre D.*, 405 Ill. App. 3d 945, 952 (2010). First, the State must prove that the parent is unfit by clear and convincing evidence. *Id.* Section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2018)) lists the grounds under which a parent can be found unfit. *In re Tiffany M.*, 353 Ill. App. 3d 883, 889 (2004). Second, if the court makes a finding of unfitness, the court then considers whether it is in the best interests of the minor to terminate parental rights. *Deandre D.*, 405 Ill. App. 3d at 953. The State has the burden of proving by a preponderance of the evidence that termination is in the minor's best interests. *Id.* We will reverse a finding of unfitness only where it is contrary to the manifest weight of the evidence; that is, where the determination is unreasonable. *In re D.W.*, 386 Ill. App. 3d 124, 139 (2008). Similarly, we will

also reverse a best-interests finding only where it is contrary to the manifest weight of the evidence. *In re N.B.*, 2019 IL App (2d) 180797, ¶ 43.

¶ 22                               A. Motion to Withdraw

¶ 23    As previously noted, appellate counsel moves to withdraw his representation concerning respondent's rights to R.W. and S.J. Counsel states that he has read the record and has found no issues of arguable merit. Further, counsel supports his motion with a memorandum of law providing a statement of facts, potential issues, and argument as to why those issues lack arguable merit. Counsel served respondent with a copy of the motion and memorandum, and we advised respondent that she had 30 days to respond. That time is past, and she has not responded.

¶ 24    For the reasons set forth in counsel's memorandum of law, we agree that it would be frivolous to argue, as to R.W. or S.J., that the trial court's finding that respondent is unfit was contrary to the manifest weight of the evidence or that termination of parental rights is not in their best interests.

¶ 25    Again, a trial court's unfitness finding will not be disturbed on review unless it is contrary to the manifest weight of the evidence. *In re Gwynne P.*, 215 Ill. 2d 340, 354 (2005). Although the trial court found respondent unfit on all grounds alleged in the State's petition to terminate parental rights, we need not consider them all, as one, if not contrary to the manifest weight of the evidence, is sufficient to affirm the court's finding. *Id.* at 350. As counsel points out, it was not contrary to the manifest weight of the evidence for the court to find that respondent failed to protect the minors from an environment injurious to their welfare (750 ILCS 50/1(D)(g) (West 2018)).

¶ 26    Although a parent may use corporal punishment, the use may not be excessive, or it constitutes abuse. See, *e.g.*, 705 ILCS 405/2-3 (West 2018); *In re J.P.*, 294 Ill. App. 3d 991, 1000, 1002-04 (1998). Here, respondent admitted that both she and R.W.'s father repeatedly used a belt

to strike the three young children, leaving not only marks, but scars. She admitted that she knew about the lasting marks on their bodies, yet the reports reflected both that she remained protective of R.W.'s father and that she did not understand why the discipline was inappropriate, abusive, or why she was being "punished." Thus, whether respondent inflicted the punishment using a belt or, as some collateral sources suggested, only R.W.'s father did, it remains that, at a minimum, she knew what was happening and did not protect the children from the injurious environment. Although the court partially relied on exhibit No. 5 for its ruling on count II, which it improperly believed had been offered into evidence and admitted, it also noted that respondent's admissions were unrebutted, and the same evidence was available in properly-admitted exhibit No. 1. Simply put, there would be no arguable merit for counsel to assert that the court's finding that respondent failed to protect the children from an injurious environment was contrary to the manifest weight of the evidence.

¶ 27     Similarly, we agree with counsel that there is no arguable merit to a claim that it was contrary to the manifest weight of the evidence for the trial court to conclude that termination of parental rights was in R.W.'s and S.J.'s best interests. See *In re Janira T.*, 368 Ill. App. 3d 883, 894 (2006). At the best-interests stage, the court "focuses upon the child's welfare and whether termination would improve the child's future financial, social[,] and emotional atmosphere." *In re D.M.*, 336 Ill. App. 3d 766, 772 (2002). "[A]t a best[-]interests hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *In re D.T.*, 212 Ill. 2d 347, 364 (2004). The court must consider the following factors in making a best-interests determination: (1) the physical safety and welfare of the child; (2) the development of the child's identity; (3) the child's background and ties; (4) the child's sense of attachments, including where the child feels love, attachment, and security; (5) the child's wishes

and long-term goals; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parent figures, siblings, and other relatives; (8) the uniqueness of every family and child; (9) the risks attendant to entering and being in substitute care; and (10) the preferences of the persons available to care for the child. 705 ILCS 405/1-3(4.05) (West 2018).

¶ 28    The evidence here reflected that both R.W. and S.J have been living with foster families that care for them and wish to adopt them, whereas respondent had not seen the children since December 2019. Their needs were being met respectively by the foster families, and although they were not placed in the same home, the families actively supported a relationship between the children. Further, although the children are African-American and respondent expressed cultural concern, since the foster families are Caucasian, the court noted that there existed evidence that the foster families supported cultural recognition. In sum, the evidence clearly established by at least a preponderance of the evidence that it was in their best interests for respondent's rights to be terminated and, thus, any argument to the contrary would lack even arguable merit.

¶ 29    In sum, counsel's motion to withdraw regarding respondent's appeal of her rights to R.W. and S.J. is granted, and the trial court's findings are affirmed.

¶ 30                                B. Best Interests

¶ 31    Next, respondent argues that the trial court's finding that it was in T.S.'s best interests for respondent's rights to be terminated was contrary to the manifest weight of the evidence. Specifically, respondent acknowledges that, "[i]f [T.S.] had a prospect of a decent placement anywhere in the foreseeable future, termination of [respondent's] parental rights to facilitate such a result would be appropriate ***." However, respondent argues, T.S. is not in a stable and loving home; she is in a residential facility with no imminent placement due to her extreme behaviors.

Respondent notes that T.S. was in care for a total of one year from the completion of the first service plan to the filing of the motion to terminate rights. In that time, she has had no stability, has not bonded with anyone in a placement, and no permanent home has yet been found for her. Respondent asserts that the residential facility is not an appropriate long-term placement for a child. In addition, respondent contends that she was given very limited time before her parental rights were terminated and, therefore, it would be in T.S.'s best interests *not* to terminate respondent's rights, but, rather, to give her time to complete required services such that at least the possibility of a reunion with T.S. would remain available. Respondent contends that terminating her rights provides no benefit to T.S.; it does not provide permanence, make adoption more likely, or provide any other benefit, such as love, attachment, community[,] or stability. "In short, maintaining [respondent's] parental rights, while requiring her engagement in services, provides the most likely probability of [T.S.] having a loving, safe, appropriate and permanent home in the reasonably[-]foreseeable future." We disagree.

¶ 32    Again, the State has the burden of proving by only a preponderance of the evidence that termination is in the minor's best interests (*Deandre D.*, 405 Ill. App. 3d at 953), and we will not reverse an unfitness finding unless it is contrary to the manifest weight of the evidence; that is, unless it is unreasonable (*In re D.W.*, 386 Ill. App. 3d 124, 139 (2008)). We cannot conclude here that the trial court's finding was unreasonable.

¶ 33    The evidence reflected that T.S. had "horrendous" scarring from being beaten with a belt; according to her brother, she was hit "all the time." It is undisputed that respondent either inflicted the wounds, allowed those wounds to be inflicted by another, or both. Upon being removed from respondent's care, it became evident that T.S. carried non-visible wounds, including RAD, an attachment disorder that made difficult any placement within a traditional foster-family

environment. Thus, while, at first blush, respondent's argument may sound somewhat reasonable, it actually turns the analysis on its head: namely, it is instead possible that, if she or her paramour had beaten T.S. *less severely*, T.S. might have had an easier time attaching to a family and obtaining a quick placement. As such, it is not reasonable to accept that, due to the severity of the wounds inflicted by or with the knowledge of respondent, T.S. is having trouble obtaining placement and, therefore, that leaving open a possible return to respondent would be in her best interests.

¶ 34    Further, the court was presented with evidence that, although she had some trouble with her peers, T.S. was doing well at Lydia House, and the guardian *ad litem* testified that the facility was what T.S. *needed* in order to address her issues so that she can find a new home. While respondent suggests that long-term placement there is not in her best interests, long-term placement in the facility is no one's goal. The goal is to help T.S. so that she can find a new home, and Sanders testified that DCFS remains actively looking for a new, appropriate placement for her. It was not unreasonable for the trial court to agree with the guardian's position that it was in T.S.'s interest to remain at the facility, with an understanding that she is not returning to respondent's care, as opposed to her lingering either in that facility or in a future placement with uncertainty regarding whether she would, at some time, be returned to the care of the very person who had hurt her. In that vein, we disagree with respondent; indeed, termination of her rights provides T.S. with permanence and stability in the knowledge that she will not be returned to respondent, who loves her, but is unable to keep her safe. Terminating respondent's rights makes adoption more likely, because, by allowing T.S. to remain in the facility until her needs are addressed, she is more likely to successfully adjust to a future home placement.

¶ 35    In contrast, the court received no evidence that respondent would be in a position to provide T.S. any stability, help her with her physical and emotional scars, or correct her own behavior. Indeed, respondent has also been sentenced to *two years'* probation, with the order providing that she have no contact with T.S., unless approved and supervised. The court could have reasonably found that a minimum of two more years of uncertainty, lack of contact, or only supervised contact, was not encouraging, in terms of giving T.S. a sense of permanency. In addition, while the process here from intake to termination might not have been long, relatively speaking, we will not find fault with the speed, as these cases are properly accelerated, and, regardless of length, respondent completed *no* services, was imprisoned, moved out of state, and, in fact, continued to resist acknowledging that her behavior was inappropriate and damaging to the children.

¶ 36    In the end, while cliché, it is simply true that sometimes love is not enough. It was not contrary to the manifest weight of the evidence for the court to find that it was in T.S.'s best interests to terminate respondent's parental rights.

¶ 37                                III. CONCLUSION

¶ 38    For the reasons stated, the judgment of the circuit court of Winnebago County is affirmed.

¶ 39    Affirmed.