NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2025 IL App (4th) 250641-U

NOS. 4-25-0641, 4-25-0648 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
November 10, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| In re R.C. and T.C., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Knox County |
|     Petitioner-Appellee, | ) | Nos. 23JA36 |
|     v. | ) |     23JA37 |
| Steven C., | ) | |
|     Respondent-Appellant). | ) | Honorable |
| | ) | Chad M. Long, |
| | ) | Judge Presiding. |

JUSTICE DOHERTY delivered the judgment of the court.
Justices Lannerd and Grischow concurred in the judgment.

**ORDER**

¶ 1    *Held*: The appellate court affirmed the trial court's judgment terminating respondent's parental rights, concluding the court's best-interest finding was not against the manifest weight of the evidence and it did not conflate fitness and best interest when making its best-interest determination.

¶ 2    In December 2024, the State filed a petition to terminate the parental rights of respondent Steven C. as to his minor sons, T.C. (born 2009) and R.C. (born 2021). Rebecca S., the boys' mother, is not a party to this appeal. In June 2025, the trial court found termination of respondent's parental rights was in his children's best interest.

¶ 3    Respondent appeals, arguing the trial court's best-interest finding was against the manifest weight of the evidence. Respondent also contends the court conflated fitness and best interest when making its determination as to the latter. We affirm.

¶ 4                                      I. BACKGROUND

¶ 5        In May 2023, respondent and Rebbecca got into a physical altercation in front of R.C. and T.C. When the police arrived, they learned that respondent picked R.C. up by the neck, causing red, purple, and brown bruising. Respondent was arrested for one count of domestic battery of a child and two counts of domestic battery. Two months later, the State filed a two-count petition to adjudicate R.C. (1) neglected, as his environment was injurious to his welfare (705 ILCS 405/2-3(1)(b) (West 2022)) (count I) and (2) abused (*id.* § 2-3(2)(i), (v)) (count II). The State also petitioned to adjudicate T.C. neglected under count I. The trial court adjudicated both children neglected, found respondent unfit, made the children wards of the court, and placed their guardianship and custody with the Illinois Department of Children and Family Services (DCFS).

¶ 6        In December 2024, the State filed a petition to terminate respondent's parental rights, alleging respondent was unfit because he failed to (1) maintain a reasonable degree of interest in or concern or responsibility for the children (750 ILCS 50/1(D)(b) (West 2024)); (2) make reasonable efforts in a nine-month period, from October 4, 2023, to July 4, 2024, to correct the conditions that caused the children to be adjudicated neglected and removed from his care (*id.* § 1(D)(m)(i)); and (3) make reasonable progress during the same nine-month period toward having the children returned to his care (*id.* § 1(D)(m)(ii)). In May 2025, the trial court found respondent unfit on all three bases.

¶ 7        At the June 2025 best-interest hearing, Heather Stokes, a DCFS child welfare specialist assigned to the case, testified that T.C., who was nonverbal and diagnosed with autism, had been living at Little City in Birch Home (Birch Home) for a year. Birch Home was a facility for youth with developmental disabilities. Employees there provided food, clothing, shelter, and medical care for T.C.; ensured he attended school; helped him develop a routine; and taught him how to become more independent. T.C.'s community consisted of the staff and patients at Birch

Home, who gave T.C. a sense of stability and with whom T.C. had bonded. Stokes stated that although T.C. did not like living at Birch Home initially, he now seemed comfortable and "very happy there." Stokes asserted she had no concerns about T.C.'s placement at Birch Home, noting he will transition to adult care when he is 18 and the State, as his guardian, will advocate for him and his medical needs. Stokes was not aware of anyone who wanted to adopt T.C.

¶ 8 Regarding R.C., Stokes stated emergency placement was with R.C.'s teacher. R.C. came to know his current foster parents because the foster mother is the sister of R.C.'s teacher. While in his teacher's care, R.C. "spent a lot of time" with the current foster parents.

¶ 9 Although R.C. saw his current foster parents often prior to placement, he had been living with them for only 29 days, after they obtained their foster care licensing. Stokes confirmed the foster parents wanted to provide permanency for R.C. before he was placed with them, noting he would have been sent to another foster home if they did not wish to adopt him. Stokes testified the foster parents knew about this arrangement before R.C. moved in with them. Stokes also stated she saw R.C. four times during the month he was there. At first, R.C., was afraid Stokes was going to remove him from the foster parents' home. When he learned he was not leaving, he became excited to show Stokes around.

¶ 10 During a tour, Stokes saw that the family home, which was "very nice," had a pool R.C. liked to play in, a bedroom for R.C. that contained a bed with a Spiderman comforter, and a dresser filled with new clothes. R.C. introduced Stokes to his foster parents, who he called "mom" and "dad," and the foster father's brother, who he referred to as his uncle. Stokes never met the foster parents' teenaged daughter or older son, who was autistic but highly functional. During a visit, R.C. gave the foster mother several hugs and then sat on the foster father's lap, looking at books, talking, and coloring. Stokes asserted R.C. "seemed very comfortable with both of them,"

was "[v]ery much" happy to be there, and was "[v]ery much" attached to the foster parents. She added that R.C. felt safe with the foster parents, who fed him and provided him with stability and medical care.

¶ 11      Before being placed with the foster parents, R.C. would not listen to the adults in charge and would bite, smack, and hit other children. This behavior would occur a few days to one week after R.C. was placed. Stokes stated, "[N]ow he's actually doing much better and none of those behaviors are occurring anymore."

¶ 12      Stokes testified that R.C. was in preschool and would attend daycare over the summer, where he would learn the things he needed to know for kindergarten. The foster mother ran the licensed DCFS daycare that R.C. attended. The foster parents were planning to take R.C. with them to Florida over the summer for their daughter's cheerleading. R.C. knew about these plans and was very excited about going.

¶ 13      Stokes stated that although R.C. has had contact with his and T.C.'s grandmother and their sister, who lived with the grandmother, he has not had much contact with T.C. because T.C. was aggressive and Birch Home was far away from the foster parent's home. Stokes explained that R.C. would become scared he was moving to another foster home when he traveled to see T.C. Stokes asserted that the foster family would allow R.C. to continue to see the grandmother, his sister, and, eventually, T.C.

¶ 14      Stokes recommended that respondent's parental rights be terminated, as the children were removed from his care because of domestic violence, respondent failed to complete the services necessary to have the children returned to him, and he was kicked out of some programs when he failed to participate. Stokes noted that since the fitness hearing, which was held one month prior to this hearing, respondent was let go from two programs for failing to attend, one

of which would have helped respondent find suitable housing for him and the children. Stokes admitted, however, that respondent had completed some other services.

¶ 15 The best-interest report was admitted at the hearing, and it corroborated Stokes's testimony. It also provided that the children's grandmother, their sister, and R.C. could visit T.C. at Birch Home, and all family members, including respondent, could send T.C. cards, gifts, letters, and pictures.

¶ 16 The trial court found it was in T.C.'s and R.C.'s best interest to terminate respondent's parental rights. In so finding, the court stated that it considered all the statutory best-interest factors, Stokes's testimony, and the best-interest report. The court mentioned the case had been pending for 22 months, domestic violence continued to be an issue, and respondent failed to complete services. Given that, the court questioned whether waiting for respondent to do what was required of him would be in the children's best interest, as they both needed stability, permanence, and consistency, as well as a safe environment in which to live. The court also found that, in their current placements, the children had adequate housing, were not subject to domestic violence, and were provided with food, clothing, and shelter. The court noted Birch Home, with which the court was familiar, was probably the best place for T.C., as he felt comfortable there, had bonded with staff and other children, was doing well, and could successfully move forward. Although R.C. had lived with the foster parents for only 29 days, the court found that he was familiar with and clearly attached to them, and they were willing to provide R.C. with permanence by adopting him.

¶ 17 This appeal followed.

¶ 18                                   II. ANALYSIS

¶ 19 On appeal, respondent challenges only the trial court's best-interest ruling. He argues that the court's finding it was in the children's best interest to terminate his parental rights

was against the manifest weight of the evidence. Respondent also claims that the court improperly conflated fitness and best interest when making its determination of the latter.

¶ 20 Under section 2-29(2) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-29(2) (West 2024)), the involuntary termination of parental rights involves a two-step process. First, the State must prove by clear and convincing evidence the parent is "unfit," as that term is defined in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2024)). *In re Donald A.G.*, 221 Ill. 2d 234, 244 (2006). After a trial court finds a parent unfit, "the court then determines whether it is in the best interests of the minor that parental rights be terminated." *In re D.T.*, 212 Ill. 2d 347, 352 (2004).

¶ 21 "[A]t a best-interests hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *Id.* at 364. The State must prove by a preponderance of the evidence termination of parental rights is in the minor's best interest. *Id.* at 366. In making the best-interest determination, the court must consider the factors set forth in section 1-3(4.05) of the Juvenile Court Act (705 ILCS 405/1-3(4.05) (West 2024)). These factors include:

> "(1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's background and ties, including familial, cultural, and religious; (4) the child's sense of attachments, including love, security, familiarity, and continuity of affection, and the least-disruptive placement alternative; (5) the child's wishes; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parental figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the persons available to care for the

child." *In re Jay. H.*, 395 Ill. App. 3d 1063, 1071 (2009) (citing 705 ILCS 405/1-3(4.05) (West 2008)).

"The court's best interest determination [need not] contain an explicit reference to each of these factors, and a reviewing court need not rely on any basis used by the trial court below in affirming its decision." *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 19. On review, "[w]e will not disturb a court's finding that termination is in the [child's] best interest unless it was against the manifest weight of the evidence." *In re T.A.*, 359 Ill. App. 3d 953, 961 (2005). "A finding is against the manifest weight of the evidence only if the evidence clearly calls for the opposite finding [citation], such that no reasonable person could arrive at the [trial] court's finding on the basis of the evidence in the record." (Internal quotation marks omitted.) *In re J.H.*, 2020 IL App (4th) 200150, ¶ 68.

¶ 22        Here, the evidence revealed T.C. and R.C. have stability, security, and a sense of community in their current placements, and both places provide each boy with food, clothing, shelter, and medical care. At Birch Home, T.C. has a routine, which includes furthering his education and providing him with the skills he will need to be as independent as possible in the future. T.C. has bonded with the people at Birch Home and is happy there. Under the care of his foster parents, R.C. no longer acts out and is learning what he needs to know before starting kindergarten. R.C. loves the foster parents dearly, refers to them as "mom" and "dad," and is included in extended family gatherings. Moreover, the foster parents, who wish to provide R.C. with permanence by adopting him, will work to ensure he maintains contact with his grandmother, sister, and, when he is ready, T.C. Given the evidence, we cannot find that the trial court's best-interest finding was against the manifest weight of the evidence.

¶ 23        In reaching this conclusion, we find unavailing respondent's claim that the trial court's best-interest determination is against the manifest weight evidence because (1) R.C. has

lived with the foster parents for only 29 days, and thus, terminating respondent's parental rights was premature and (2) T.C., who has no beneficial family connections and no one to adopt him, could remain at Birch Home without terminating respondent's parental rights.

¶ 24　　　　First, although it is true that R.C. lived in his current placement for only a short time, he came to know his foster parents well when he lived with his teacher. The foster parents took R.C. into their home and obtained the proper licensing, knowing they wanted to adopt him. Respondent claims this fact "demonstrates the artificial nature of this placement arrangement," not R.C.'s best interest. We disagree. In our view, the fact that the foster parents chose to take R.C. into their home on the condition they had to adopt him shows exactly how much they love him, wish to provide for him, and are committed to raising him. We find speculative respondent's concern that R.C. may be kicked out of the foster parents' home because Stokes has not met the two biological children and that R.C. could start to exhibit the same bad behavior observed in other placements. Aside from the fact that R.C. has been living with the other children for 29 days without incident, Stokes specifically testified R.C. no longer exhibited bad behavior after he moved in with the foster parents, and he was very excited to accompany them to Florida for their daughter's cheerleading. It seems implausible that R.C. would wish to do so if he did not get along with the foster parent's children in general and their daughter in particular.

¶ 25　　　　Second, concerning T.C., the evidence revealed T.C. would have contact with his grandmother and sister, and Stokes indicated that, once R.C. is ready, the foster parents would support R.C. seeing his brother. Moreover, nothing prevents respondent from having contact with T.C. through the mail. In addition to sending T.C. letters, respondent is allowed to send him gifts, cards, and pictures. The fact that it may be possible for T.C. to remain at Birch Home without terminating respondent's parental rights does not mean that doing so is in T.C.'s best interest. As

the court observed, both R.C. and T.C. need some sense of stability and consistency, which respondent has been unable to provide them. Terminating respondent's parental rights in this situation serves T.C.'s best interest. See *In re R.W.*, 2021 IL App (2d) 200581-U, ¶¶ 31-36.

¶ 26 We also find meritless respondent's claim the trial court conflated fitness and best interest in making its best-interest finding. Although the court mentioned at the best-interest hearing that respondent failed to complete services, which resulted in unfitness, the court did so in addressing the children's best interest, specifically, their need for security, permanence, and stability. Nothing about this consideration was improper. See *In re N.B.*, 2019 IL App (2d) 180797, ¶ 47.

¶ 27 In sum, the trial court considered the evidence in relation to the statutory best-interest factors and found all of them weighed in favor of terminating respondent's parental rights. We cannot conclude the evidence in the record "clearly calls for the opposite finding" or is such that "no reasonable person" could find as the court found. (Internal quotation marks omitted.) *J.H.*, 2020 IL App (4th) 200150, ¶ 68. Accordingly, the court's best-interest determination was not against the manifest weight of the evidence.

¶ 28                                    III. CONCLUSION

¶ 29 For the reasons stated, we affirm the trial court's judgment.

¶ 30 Affirmed.