**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2025 IL App (3d) 240550-U

Order filed February 10, 2025

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2025

| | | |
|---|---|---|
| *In re* O.H., Jr., P.H., and S.H., | ) | Appeal from the Circuit Court |
| | ) | of the 12th Judicial Circuit, |
| Minors | ) | Will County, Illinois. |
| | ) | |
| (The People of the State of Illinois, | ) | |
| | ) | Appeal Nos. 3-24-0550, 3-24-0551, |
| Petitioner-Appellee, | ) | and 3-24-0552 |
| | ) | Circuit Nos. 24-JA-48, 24-JA-49, and |
| v. | ) | 24-JA-50 |
| | ) | |
| O.H., Sr., | ) | |
| | ) | The Honorable |
| Respondent-Appellant). | ) | John J. Pavich, |
| | ) | Judge, presiding. |

_____

JUSTICE HETTEL delivered the judgment of the court.
Presiding Justice Brennan and Justice Anderson concurred in the judgment.

_____

**ORDER**

¶ 1    *Held*:  The circuit court did not err when it adjudicated the minors neglected or when it entered a dispositional order that, *inter alia*, made the minors wards of the court.

¶ 2    The circuit court entered adjudicatory and dispositional orders finding the minors, O.H., Jr., P.H., and S.H., to be neglected and making them wards of the court. On appeal, the respondent argues that the findings underlying the court's orders were erroneous. We affirm.

I. BACKGROUND

¶ 4        On February 28, 2024, the State filed juvenile petitions alleging that the minors were neglected due to an injurious environment. The petitions alleged that the minors were with their mother and father, the respondent, at a park when the respondent stabbed two individuals. At the time of the petitions, O.H., Jr., P.H., and S.H., were ages six, seven, and four, respectively.

¶ 5        The circuit court held an adjudicatory hearing on May 29, 2024, at which the State called the mother and an investigator from the Department of Children and Family Services (DCFS). The mother testified that she had been in a relationship with the respondent for 13 years. At the time of the incident in the park, the family had been living in a hotel room in Monee for the past four years. The minors were homeschooled. When asked whether she had a specific lesson plan, the mother stated that the minors each had tablets with learning applications. At the time of the incident, the mother was unemployed, while the respondent was employed at a tire shop. The mother was still unemployed at the time of the hearing. She also stated that the minors regularly saw a doctor in Indiana.

¶ 6        The mother stated that during the day on February 26, 2024, the family went to a park in Chicago Heights to celebrate the February birthdays of two of the minors. While there, the respondent got into an argument with a woman. The argument turned into a physical fight. The mother walked away from the scene with the minors during the argument. She could not drive away, however, because she did not have a license.

¶ 7        Eventually, the respondent drove the family back to the hotel. He had a cut on his hand and had gotten stabbed in the back. They stopped at a store for bandages on the way back to the hotel. The minors saw that the respondent was bleeding, and P.H. tried to help stop it. When they got

back to the hotel, the police arrived and asked to speak to the mother. She refused to speak to the police about the incident.

¶ 8    Later that night, the mother and the respondent were arrested in connection with the incident in the park. She was subsequently extradited to Missouri based on outstanding warrants for forgery, where she was placed "back on probation" and the charge was dropped. She was not charged in connection with the incident in the park.

¶ 9    At the time of the hearing, the mother was living temporarily with her aunt. When asked if S.H. had any special needs, the mother said she was not aware of any. She also stated that S.H. "was starting to talk and started to do things. She was just at the stage where she was starting to learn how to do stuff."

¶ 10    On cross-examination, the mother admitted that she did not know the name or address of the doctor to whom she took the minors. She also admitted that she did not take them for yearly checkups or regular visits, even though she should have done so. The mother added that she believed S.H. was "just learning at a slow pace even though by now she should be saying words and stuff." She confirmed that S.H. was five years old at the time of the hearing.

¶ 11    DCFS investigator Felicia Ibarra testified that she spoke to the minors at the courthouse on March 1, 2024. P.H. told Ibarra that her aunt had told her not to talk about the incident in the park. Eventually, P.H. did state that the respondent was in an altercation with siblings at a park. His hand was bleeding. She also mentioned that she helped to clean up his hand with bandages. P.H. was emotional during the interview and was crying.

¶ 12    Ibarra stated that P.H. had originally been placed with her aunt before being moved to her maternal grandparents' house. P.H. and O.H., Jr., both said that their aunt told them not to talk to

3

anyone about the incident in the park. Both minors also said they had never been to school or the doctor. S.H. was nonverbal and could not communicate with Ibarra.

¶ 13        Ibarra testified that she interviewed the mother by phone; during the interview, the mother stated that the children had been to an urgent care once "or so," but there was no primary care physician for the minors.

¶ 14        After Ibarra testified, the State introduced a file-stamped copy of the criminal indictment against the respondent. The circuit court admitted the document into evidence. Notably, that document was not included in the record on appeal.

¶ 15        At the close of the hearing, the circuit court found that the minors were neglected. More specifically, the court found that while it was not clear exactly what the minors witnessed in the park, they did in fact see some sort of an altercation that ultimately became physical and resulted in serious injuries at least to the respondent. The court also found that the evidence showed that the minors were without medical care for most, if not all, of their lives. The case was then set for a dispositional hearing.

¶ 16        A Lutheran Child and Family Services (LCFS) caseworker, Sarita Garcia, prepared a report for the dispositional hearing. The report stated that the mother declined to participate in the integrated assessment. Based on record reviews, the following services were recommended for the mother: (1) engage in domestic-violence victim counseling, (2) engage in individual therapy, (3) engage in parenting-education classes and parent coaching, (4) engage in family therapy with the minors when clinically appropriate, and (5) obtain and maintain employment and suitable housing. By the date of the report (August 1, 2024), the mother had not engaged in individual therapy, obtained employment or housing, or participated in a domestic-violence victim assessment. The

report also stated that the primary issue with the mother's functioning was the "power and control dynamic perpetrated by her paramour [the respondent]."

¶ 17    Regarding the respondent, the report noted that he was incarcerated in the Cook County Jail based on murder and attempted murder charges. An integrated assessment was not completed because the jail only allowed Zoom interviews; Health Insurance Portability and Accountability Act (42 U.S.C. § 1320d-2 (2024)) regulations prevented integrated assessments from being performed via Zoom. Based on record reviews, the following services were recommended for the respondent: (1) resolve his criminal case, (2) complete a psychiatric assessment, (3) complete a substance abuse assessment, (4) participate in a domestic-violence program, (5) engage in individual psychotherapy, and (6) engage in parenting-education classes and parent coaching.

¶ 18    The report noted that the respondent called Garcia in March 2024 to discuss updates regarding the minors. At that time, the respondent "was informed of the process when being involved with DCFS." Garcia also discussed placement options for the minors with the respondent. The report also noted that "the concern is [the respondent's] power and control over his family." Garcia also expressed concern that the respondent would isolate the minors and their mother from professional help and natural supports. The report also highlighted that the minors were not enrolled in school and had no medical history.

¶ 19    On August 30, 2024, the circuit court held the dispositional hearing. Several documents were introduced into evidence at the outset of the hearing, including Garcia's dispositional report. The service plans were also admitted, which contained, *inter alia*, a summary of the incident in the park:

>       "DCFS records indicate that on 2/27/24, while at a community park with her children, her paramour, [the respondent], accused and confronted individual (22) of

'staring at him.' The individual repeatedly asked [the mother] to remove [the respondent] from the situation due to his increases of frustration and use of profanity towards her. [The respondent] became assaultive. That person's minor siblings (ages 15 and 13) tried to intervene, and [the respondent] took out a knife and stabbed both, resulting in the death of the 13-year-old minor, and placing the 15-year-old minor in critical condition. [The mother] and [the respondent] fled the scene with their children to a nearby hotel and were later apprehended by police. [The respondent] was later arrested and charged with first degree murder and attempted first degree murder."

Further, the service plans indicated that the respondent displayed "power and control dynamics" in his relationship with the mother, including by isolating her from her immediate family. In addition, the service plans noted that because neither the mother nor the respondent participated in the integrated assessments, the assessments were based on information contained in "[c]ase notes and records in the State Automated Child Welfare Information System (SACWIS)," "[c]ommunication with Permanency Worker," "Law Enforcement Agencies Data System (LEADS)," and "Division of Child Protection *** Handoff Documents." Further, the service plans noted that LEADS returned a criminal history for the respondent containing 100 charges and 14 convictions, the latter of which included convictions for assault and three convictions for "[d]angerous drugs."

¶ 20    Garcia testified in accord with the report she prepared for the hearing. She also testified that she had not discussed the service plan with the respondent, although she did mail it to him at the jail. She was unsure if he had received it. She also was unaware of whether the jail offered any services, but the respondent told her that no services were available there.

6

¶ 21    The respondent testified that he believed there was no information on him in SACWIS "because I know I have not ever had any allegations or investigations or any of such matters regarding *** domestic violence, drug use, or any type of mental instability." In addition, the following exchange took place with defense counsel:

> "[DEFENSE COUNSEL]: And I have told you that in order for you to appeal the services in the service plan you need to do that through the agency, correct?
>
> [THE RESPONDENT]: Yes, ma'am, but I failed to understand how that would benefit today's hearing if they are allowed to put in the information that may be misleading to the court that does not exist within the system of SACWIS."

On cross-examination, the respondent admitted that SACWIS relied on past and current investigations. However, he disagreed that he was the subject of a current investigation.

¶ 22    At the close of the dispositional hearing, the court found that it was in the minors' best interest to be made wards of the court due, in part, to the respondent's failure to complete services. The court also found the respondent to be unable to care for the minors due to that failure and his ongoing criminal case. Guardianship was assigned to DCFS with the right to place the minors.

¶ 23    The respondent appealed.

¶ 24                                    II. ANALYSIS

¶ 25    The respondent's first argument on appeal is that the circuit court erred when it adjudicated the minors neglected.

¶ 26    When considering whether a minor should be made a ward of the court, the Juvenile Court Act of 1987 (Act) (705 ILCS 405/1-1 *et seq.* (West 2022)) establishes a two-step process. *In re A.P.*, 2012 IL 113875, ¶ 18. The first step is to conduct an adjudicatory hearing wherein the circuit court considers whether the minor is abused, neglected, or dependent. 705 ILCS 405/2-18(1) (West

7

2022). In relevant part, two grounds upon which a minor may be found neglected are (1) an environment that is injurious to the minor's welfare (*id.* § 2-3(1)(b)), and (2) when a minor "is not receiving the proper or necessary support, education as required by law, or medical or other remedial care recognized under State law as necessary for a minor's well-being" (*id.* § 2-3(1)(a)). Regarding the former ground, "the term 'injurious environment' has been recognized by our courts as an amorphous concept that cannot be defined with particularity." *In re Arthur H.*, 212 Ill. 2d 441, 463 (2004). However, our supreme court has stated that the term "has been interpreted to include the breach of a parent's duty to ensure a safe and nurturing shelter for his or her children." (Internal quotation marks omitted.) *Id.* We will not disturb a circuit court's adjudicatory ruling unless it is against the manifest weight of the evidence. *Id.* at 464.

¶ 27　　　The respondent focuses his argument on this issue on the mother's conduct during and after the incident at the park, stating that she removed the minors from the scene, did not observe any physical altercation, and helped the respondent by driving him to the store to obtain bandages. He also emphasizes that at the time of the hearing, critical facts about the incident in the park were unknown, including whether he acted in self-defense. Further, the respondent contends that the mother was attentive to the minors' needs, as evidenced by her testimony that "her youngest child, age four, was reaching milestones such as beginning to talk, learning new skills, and developing at her own pace, albeit slightly slower than typical," and "while she hadn't taken her children for yearly check-ups, she ensured they received medical attention whenever they were sick by taking them to the hospital or doctor." The respondent's argument is misplaced.

¶ 28　　　At the adjudicatory stage, the circuit court is required to focus solely on whether the minor is neglected. *Id.* at 467 (holding that the statutory scheme "instructs the circuit court during the adjudicatory hearing to determine whether the child is neglected, and not whether the parents are

8

neglectful"); *In re V.S.*, 2023 IL App (1st) 220817, ¶ 59 (holding that "the cause of the neglect is not relevant at the adjudicatory stage"). The actions taken by the mother during the incident in the park are largely immaterial. The fact that the minors were present for at least part of the verbal and physical incident apparently instigated by the respondent, during which he stabbed two teenagers and killed one of them, is sufficient by itself to establish that the parents breached their duty of ensuring a safe and nurturing environment for their children. See *Arthur H.*, 212 Ill. 2d at 463.

¶ 29        Moreover, the evidence established that the minors were medically neglected under section 2-3(1)(a) of the Act. The State's evidence showed that the minors had essentially no medical history. When asked about it, the mother equivocated and admitted that the minors had not gone to the doctor enough. What she testified to, in fact, apparently constituted just one occasion when the minors were taken to a clinic. Further, the youngest child had clear developmental concerns that had not been addressed. Contrary to the respondent's claim, the evidence did not show that the mother "ensured [the minors] received medical attention whenever they were sick by taking them to the hospital or doctor." Under these circumstances, we hold that the circuit court's neglect finding was not against the manifest weight of the evidence.

¶ 30        The respondent's second argument relates to the circuit court's dispositional order. We find it difficult to summarize the respondent's argument, however, as it conflates numerous aspects of the dispositional process. For example, he argues in part that the circuit court's findings that he

> "had services still to complete, that services were unsuccessful in addressing the conditions for reunification, and that DCFS had made reasonable efforts to facilitate the achievement of the permanency goal were against the manifest weight of the evidence. These findings, made in error, were the court's justification for establishing the minors as wards of the court."

The respondent's argument misunderstands the dispositional process. At the dispositional hearing, the initial question to decide is whether a minor should be made a ward of the court. 705 ILCS 405/2-21(2) (West 2022). It is only after determining that a minor must be made a ward that the court addresses matters such as the permanency goal, the nature of the service plan and the specific services parents must undertake, and the placement of the minor. *Id.*, § 2-27(1).

¶ 31        The standard for considering wardship is whether it "is consistent with the health, safety and best interests of the minor and the public." 705 ILCS 405/2-21(2) (West 2022); *A.P.*, 2012 IL 113875, ¶ 21. Section 1-3(4.05) of the Act provides that whenever a "best interest" determination must be made under the Act,

> "the following factors shall be considered in the context of the child's age and developmental needs:
>
> (a) the physical safety and welfare of the child, including food, shelter, health, and clothing;
>
> (b) the development of the child's identity;
>
> (c) the child's background and ties, including familial, cultural, and religious;
>
> (d) the child's sense of attachments, including:
>
> (i) where the child actually feels love, attachment, and a sense of being valued (as opposed to where adults believe the child should feel such love, attachment, and a sense of being valued);
>
> (ii) the child's sense of security;
>
> (iii) the child's sense of familiarity;
>
> (iv) continuity of affection for the child;
>
> (v) the least disruptive placement alternative for the child;

10

(e) the child's wishes and long-term goals;

(f) the child's community ties, including church, school, and friends;

(g) the child's need for permanence which includes the child's need for stability and continuity of relationships with parent figures and with siblings and other relatives;

(h) the uniqueness of every family and child;

(i) the risks attendant to entering and being in substitute care; and

(j) the preferences of the persons available to care for the child." 705 ILCS 405/1-3(4.05) (West 2022).

At the dispositional stage, the court may also consider actions of the parents. *Arthur H.*, 212 Ill. 2d at 466. A circuit court's dispositional findings will not be disturbed unless they are against the manifest weight of the evidence. *In re D.W.*, 386 Ill. App. 3d 124, 139 (2008).

¶ 32    The respondent does not actually challenge the circuit court's wardship determination, evidenced in part by the fact that he does not discuss any of the above-mentioned factors in his opening brief as they relate to the wardship determination. Nor does he actually challenge the other aspects of the dispositional order, including the placement of the minors. Rather, the respondent argues that (1) DCFS failed to comply with the statutory deadline for filing a service plan, (2) the caseworker did not speak to the respondent or ensure that he had received the service plan, (3) LCFS did not tailor the service plan to the respondent's status as an incarcerated individual, and (4) the service plan was compiled without a personal interview of the respondent. In essence, he claims that his ability to make progress on his tasks was sabotaged by a defective service plan. These arguments all pertain to the creation and implementation of the initial service plan, not whether the minors should have been made wards of the court. The record does not reflect that the respondent ever challenged his service plan at the agency level. See, *e.g.*, 89 Ill. Admin. Code §§

11

337.30, 337.70(a) (West 2022) (describing the agency service-appeal process and specifying what can be challenged, including "the failure to complete a service plan within 45 calendar days after case opening," "the failure to provide services as specified in the service plan with reasonable promptness," and "the imposition of unnecessary services or conditions as part of a service plan"). In fact, the record shows that defense counsel informed the respondent that if he wanted to contest the service plan, he had to do so through the agency. The arguments the respondent has made regarding the service plan are not valid bases upon which the circuit court's dispositional order could be reversed. Moreover, the respondent's progress on his tasks is but one possible consideration in the best-interest determination. See *Arthur H.*, 212 Ill. 2d at 466; 705 ILCS 405/1-3(4.05), 2-21(2) (West 2022). Under the circumstances of this case, we find no error in the circuit court's dispositional order.

¶ 33                                III. CONCLUSION

¶ 34        The judgment of the circuit court of Will County is affirmed.

¶ 35        Affirmed.