2025 IL App (2d) 250272-U
No. 2-25-0272
Order filed October 28, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| *In re* J.E.R., J.O.R., J.R., and E.R., Minors, | ) | Appeal from the Circuit Court |
| | ) | of McHenry County. |
| | ) | |
| | ) | Nos. 22-JA-87 |
| | ) | 22-JA-88 |
| | ) | 22-JA-89 |
| | ) | 22-JA-90 |
| | ) | |
| | ) | Honorable |
| (The People of the State of Illinois, Petitioner- | ) | Carl E. Metz, |
| Appellee v. Jeremy R., Respondent-Appellant). | ) | Judge, Presiding. |

_____

JUSTICE JORGENSEN delivered the judgment of the court.
Justices Hutchinson and Schostok concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The trial court's finding that respondent was unfit is not against the manifest weight of the evidence.  Affirmed.

¶ 2    Respondent, Jeremy R., appeals from the trial court's order finding him unfit to parent his children, J.E.R., J.O.R., J.R., and E.R.   For the following reasons, we affirm.

¶ 3                                I. BACKGROUND

¶ 4    Respondent is father to J.E.R. (born July 8, 2019), J.O.R. (born February 25, 2018), J.R. (born April 18, 2017), and E.R. (born October 14, 2010).   Their mother, Erica B., is not party to

this appeal, but has appealed in case No. 2-25-0278. On September 16, 2022, the minors came into care after a shelter care hearing that was prompted by a hospital visit concerning J.R., Jr. (born December 25, 2007), respondent's eldest child, who is not a subject of this appeal. Thereafter, on March 24, 2023, the four minor children were adjudicated neglected based upon a lack of support, education, and care and for being in an environment injurious to their welfare. On April 21, 2023, a dispositional order was entered in which the Department of Children and Family Services (DCFS) was named as their guardian and custodian. Ultimately, on November 1, 2024, the State petitioned to terminate respondent's parental rights, alleging that he was unfit based upon his failure to: (1) maintain a reasonable degree of interest, concern, or responsibility for the minors (750 ILCS 50/1(D)(b) (2022)); (2) protect the minors from the conditions within their environment injurious to their welfare (*id.* § 1(D)(g)); (3) make reasonable efforts to correct the conditions that were the basis for the minors' removal for a nine-month period between September 8, 2023, and October 11, 2024 (*id.* § 1(D)(m)(i)); and (4) make reasonable progress toward the minors' return to his care between September 8, 2023, and October 11, 2024. (*id.* § 1(D)(m)(ii)). On appeal, respondent challenges only the court's findings of unfitness.

¶ 5    At the fitness hearing, the court took judicial notice of the prior court orders; permanency-review hearings; and DCFS service plans, reports, and other exhibits. In addition, Dionca Harper, Child Protection Specialist for DCFS, testified concerning observations that she had documented in her September 2022 investigative report, *i.e.*, the conditions of neglect that led to protective custody of the children. Specifically, the report reflected that Harper had been called to the hospital to observe J.R., Jr., who was severely malnourished, in "very bad shape," and could not lift his head off the pillow. Harper testified that he was small for his age, nonverbal, and his leg was not

lying normally and it was in an "L-shape."[1]  Harper then went with a police officer to the family residence in Woodstock, where garbage was piled up inside the townhome, the carpet was soiled with food and dirt, mold was in the bathroom, and the youngest was wearing a soiled diaper, had not been recently bathed, and had dry feces on his hair and nails.  One of the children had been sleeping on a mattress on the floor.  The investigative report noted that the children "appeared to be in a feral state."  The three youngest children were confined upstairs by a dog gate affixed with bungee cords, and they were observed eating crumbs and candy off of the floor.  The report reflected that only one of the five children is verbal.  The children all appeared malnourished, despite there being food in the home.

¶ 6       Erica reported to Harper that respondent came to the house to help her with the children, and, when he arrived, respondent confirmed that he "helps out in the home."  Respondent said that he was "trespassed" from the house and was not living there.  The report reflected further that, prior to becoming "irate," respondent stated that he was at the home "every other day," he had

---

[1]According to the investigative report, Woodstock police and the high school resource officer went to the residence because J.R., Jr., age 14, had not been to school at all yet that 2022 school year, and the school was not able to get in contact with Erica.  When the officer eventually reached her, Erica stated that J.R., Jr. was not home, she did not know where he was, and that she thought his uncle took him.  However, she then reported that he was in bed, as he recently broke his leg, but later investigation reflected that he had broken his leg in 2020.  When the officer made entry into the residence, J.R. Jr., was found lying on the floor upstairs, appeared malnourished, was unable to walk, and had soiled himself.  J.R. Jr. had a history of autism spectrum disorder and is nonverbal.

seen the children "yesterday," and that "smallness runs in the family." According to Harper, there had been a history of reported domestic violence between respondent and Erica. When she asked Erica to pack a bag for the children, it was hard to find clothes and shoes that fit them.

¶ 7     Harper confirmed that her role was to conduct the initial investigation; however, she continued to investigate the family upon receiving a subsequent report in late 2022 or early 2023. The report concerned allegations that the parents had returned to the home, despite a stay-away order. At that time, the children were residing with their grandparents, who had moved into the home to allow the children to remain there.

¶ 8     Diana Carrasco, case worker for Youth Services Bureau (YSB), testified to integrated assessments, progress reports, and service plans prepared by YSB, which were admitted into evidence. A February 2023 integrated assessment and service plan recommended that respondent complete the following services: (1) weekly individual psychotherapy; (2) a domestic violence program; (3) parenting education that focused on children with special needs and developmental delays; (4) work with a parenting coach; (5) family therapy, when therapeutically appropriate; (6) maintain a clean and sanitary home; (7) become more involved in the children's academic and developmental treatments; and (8) participate in regular and consistent visitation with the children. Also, the assessment reported that the school-aged children had not been enrolled in school and had already missed at least half, if not more, of the school year.

¶ 9     Carrasco testified that respondent had begun parenting classes, completed a domestic violence evaluation, participated in a portion of the domestic violence program, and engaged in parent coaching. Respondent also completed a mental health assessment, which did not indicate immediate treatment needs. Despite these efforts, Carrasco noted that respondent had not

successfully completed the 26-week domestic violence program, had been unsuccessfully discharged from individual therapy, and had not engaged in recommended therapeutic services.

¶ 10    Further, Carrasco testified that the parents' visits were supervised, originally by relatives, but after the relatives permitted unsupervised visits, the children were split into multiple traditional foster placements.  From February to May 2023, since the children were in five locations, the weekly visits were conducted via Zoom, with Carrasco supervising.  Erica participated consistently, but respondent did not.  In mid-May 2023, weekly visits began in person at the Aurora YSB location, as it was the "mid-point" for all parties.  Carrasco testified that, throughout this case, respondent has lived in Woodstock, and it takes over one hour to travel from there to the visitation location in Aurora.  Both Erica and respondent were both inconsistent with their weekly visits, canceling one or two times each month until August 11, 2023, at which time the parents willingly stopped all visits.  According to respondent, he would not visit while the children were in school and due to winter weather.  The parents refused to visit the children during the holidays and two of the four children's birthdays.  Later, in March 2024, the parents began visiting again, although their attendance for the weekly Friday visits between March and October 2024 included at least one monthly cancellation.  The parents would confirm the visit 24 hours in advance, then cancel the day of the visit.  Carrasco would answer respondent's telephone call canceling the visits, and his provided reasons were "[s]ometimes it was due to transportation.  Sometimes it was money.  Sometimes it was having doctors' appointments and not being able to make it on time.  Sometimes it's due to running errands."  Although Carrasco offered to accept and deliver gifts and cards to the children, the parents never provided any.

¶ 11    Carrasco acknowledged that the parents indicated that they had transportation issues for the visits, and the agency discussed train transportation with them and also offered gas cards and

Ubers to facilitate their attendance. Although the parents requested increased visitation, it was never provided, due to their not participating in services and inappropriate behaviors with other staff during visitation. For example, during a visit in July 2024, Carrasco witnessed respondent become disrespectful with the case aid and call her a "fat bitch." Visitation always remained supervised.

¶ 12 Carrasco acknowledged that, for reasons not within respondent's control, certain services and visitation arrangements were delayed. For example, from February through May 2023, YSB was short-staffed and, so, visitation was limited to Zoom sessions and phone calls. Carrasco further confirmed that the parenting capacity assessment was delayed because the doctor took a long time to complete the assessment. Carrasco further agreed that the agency placed limits on providing transportation assistance, such as Ubers and gas cards, but "[i]f he's not working and he communicates that with my supervisor and myself, I think we could come up with a way to help him." Carrasco ultimately confirmed that, in her professional opinion, the underlying safety concerns that led to protective custody had not been remedied despite the length of time the minors had been in care.

¶ 13 Respondent testified that visitation with the children took approximately three months to begin virtually and six months to begin in person.[2] He testified that he has lived in Addison during the pendency of this case and that he last lived in Woodstock around 2019. He did not have a car and took advantage of agency assistance for transportation whenever possible. Respondent

---

[2] Prior to testifying, respondent was admonished regarding his fifth amendment right against self-incrimination, as he apparently had pending criminal charges again him "related to the situation that brought the case in."

described the visitation space as small for all the children and noted that, when visitation changed from Saturdays to Fridays, it was challenging with his work schedule. Although the visits were from 5:30 to 7:30 p.m., "Aurora is a long way from where I work or where I live." He explained that the children were often irritable on Fridays, coming straight from school to visitation. Respondent testified that he never canceled a visit because he did not want to see his kids; rather, he would cancel due to concerns about their schedules, his work schedule, or lacking sufficient information. Respondent stated that he provided gifts to the children, as well as food for dinner, every visit or every other visit.

¶ 14 On cross-examination, respondent clarified that he had access to a car but did not have a driver's license and sometimes traveled by train from his work in Addison to pick up Erica in Woodstock (an hour and a half train ride), and then they would travel to Aurora for the visit. Sometimes he would also travel to Woodstock once or twice per week to visit Erica. When asked what dates visitation commenced in person, he replied, "memory is not that sharp." Respondent acknowledged a seven-month period without visits, explaining that he and Carrasco had attempted to coordinate video visits when in-person visits could not be scheduled at that time. Respondent expressed concern about Friday visits, the small visitation space, and winter transportation. Respondent denied being verbally abusive to staff, stating that he was sometimes emotional during interactions, but only out of concern for his children. He said that, in three years, he canceled, at most, three or four visits.

¶ 15 The trial court found that the State proved all the allegations of unfitness by clear and convincing evidence. In sum, the court found Harper and Carrasco credible, direct, and forthcoming in their responses and their testimonies were consistent with the admitted exhibits. The court did not find respondent credible, noting that, when pressed to answer a question he did

not want to answer, he would state "my memory is not that sharp." Further, the court found that, although respondent testified that he lived in Addison during the pendency of this case, he failed to share that information with YSB, as all of its documentation reflected a Woodstock address. In addition, it appeared that respondent's own counsel believed that he lived in Woodstock, as counsel questioned Carrasco about how long it would take to get from Woodstock to Aurora for respondent to visit the children. The court found "[t]his is evidence of [respondent's] inability to be forthright." In addition, the court found that respondent's claim that he missed only three or four visits was unconvincing and inconsistent with all other evidence, he hesitated in answering, as if he was searching for the correct answer, as opposed to truthful testimony, and, further,

> "[Respondent] complained about the distance he had to travel for visits, understanding that it was the mid-point for all the children and parents to meet. [Respondent] testified he refused to visit during the school year on Friday afternoon/evening, because the [m]inors were irritable. Yes, [respondent] resumed visits during the school year. [Respondent] admitted canceling visits for other reasons as well. [Respondent] complained that transportation was an issue for visits but stated that he was able to get to Woodstock one to two times per week to visit [Erica]. [Respondent] also had jobs in Elgin and Carol Stream, and he did not complain about transportation issues for those locations."

¶ 16 The court found, in sum, that respondent's failure to fully engage in the recommendations, his refusal to apply the teachings from parenting class, and his inconsistent and, at times, refusal to visit the minors clearly showed his lack of interest, concern, or responsibility for them. Further, "the horrible conditions in which the [m]inors were living clearly shows a failure to protect [them] from conditions injurious to their welfare." Next, notwithstanding respondent's limited

engagement in services, as of October 11, 2024, respondent had failed to take reasonable steps to correct the conditions that were the basis of the removal or to achieve reasonable progress towards the return of the minors home, as he "demonstrated a desire not to learn the tools, which would have corrected some of the conditions that gave rise to this case." The court found that respondent was not close to reunification with the minors, could not demonstrate an understanding as to why the children came into care, did not appreciate the "squalid conditions" in which the children were being raised and how those conditions impacted them, and respondent not only did not demonstrate an understanding of the parenting skills taught in class, but he also "articulated an intent to never apply the skills taught in parenting class. Parenting class provide[s] skills that would correct some of the conditions that gave rise to the minors being taken into care, and [respondent] defiantly refused to learn." Finally, the court found that respondent blamed Erica and refused to acknowledge the conditions and accept responsibility. In sum, the court found respondent unfit on all bases alleged. Later, after a separate hearing, the court also found that it was in the minors' best interest for respondent's parental rights to be terminated.

¶ 17    Respondent appeals.

¶ 18                                II. ANALYSIS

¶ 19    Proceedings to terminate parental rights are governed principally by the Juvenile Court Act of 1987 (705 ILCS 405/1-1 *et seq.* (West 2022)) (Act) and the Adoption Act (750 ILCS 50/1 *et seq.* (West 2022)). The Act provides a two-step process for the involuntary termination of parental rights. *In re Deandre D.*, 405 Ill. App. 3d 945, 952 (2010). First, the State must prove that the parent is unfit by clear and convincing evidence. *Id.* Section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2022)) lists the grounds under which a parent can be found unfit. *In re Tiffany M.*, 353 Ill. App. 3d 883, 889 (2004). Second, if the court makes a finding of unfitness, the court then

considers whether it is in the best interests of the minor to terminate parental rights. *Deandre D.*, 405 Ill. App. 3d at 953. The State has the burden of proving by a preponderance of the evidence that termination is in the minor's best interests. *Id.*

¶ 20 As to unfitness, the only finding challenged here, we will reverse only where the finding is against the manifest weight of the evidence, that is, where the determination is unreasonable. *In re D.W.*, 386 Ill. App. 3d 124, 139 (2008). "Generally, a finding of unfitness is entitled to deference and [ ] should be upheld." *In re J.J.*, 201 Ill. 2d 236, 253 (2002). The grounds for finding unfitness under the Adoption Act are independent, and we may affirm the trial court's judgment if the evidence supports any one of the grounds alleged. See 750 ILCS 50/1(D)(m) (West 2022); see also *In re B'Yata I.*, 2014 IL App (2d) 130558-B, ¶ 30.

¶ 21 In his brief on appeal, respondent attacks the court's findings as to each ground of unfitness. However, we may affirm if any one ground is supported. At a minimum, we conclude that the court's finding that respondent was unfit due to his failure to protect the children from conditions within their environment injurious to their welfare (750 ILCS 50/1(D)(g) (West 2022) was not unreasonable.

¶ 22 Specifically, a parent may be found unfit under section 1(D)(g) of the Adoption Act for the same conduct that resulted in the initial removal of the child. *In re C.W.*, 199 Ill. 2d 198, 212, 216 (2002); see also *In re Janine*, 342 Ill. App. 3d 1041, 1050 (2003) (evidence that, prior to their removal, the respondent allowed the children to live in a home with domestic abuse was sufficient to uphold unfitness finding under section 1(D)(g)). Here, however, respondent argues that the court erred in its finding that he failed to protect the children from their environment because he did not even reside in the household with the children at the time of the removal, and, in fact, he had been excluded from the home since 2020, following a restraining order. He notes that Erica

confirmed that responded did not live with her. Accordingly, respondent argues, although he maintained a continuing relationship with Erica, he did not control the conditions inside the residence and the evidence did not prove that he was aware of the injurious conditions. Respondent argues that the evidence reflected only family dynamics, not that he failed to protect the children from environmental conditions injurious to their welfare. We disagree.

¶ 23   The evidence reflected that, when Harper was at the residence, Erica explained that respondent comes to the house to help her with the children. Indeed, respondent showed up at the residence when Harper was there. Harper reported that respondent confirmed that he helped out in the home, that he was at the house every other day, and that he had just seen the children the previous day. The conditions in which the children were found were not of a fleeting or sudden nature. Indeed, even setting aside the degree of unsanitary or unsafe conditions (such as mold in the bathroom, piled up garbage, feces on the childrens' bodies, and a dog gate secured with bungee cords at the top of the stairs), the evidence reflected that the children were malnourished and not enrolled in or attending school. The trial court described the conditions as "horrible" and "squalid." It strains credulity that respondent did not observe these conditions during his visits to help with the children, particularly if he was there the day before Harper arrived. Yet there is no evidence reflecting that he took any measures to protect them from the injurious environment. Respondent's argument that he could not be found unfit for his failure to protect when he did not live in the home is not well-taken, given his frequent presence there. In sum, the court reasonably found that the State established by clear and convincing evidence that respondent was unfit for failing to protect the children from conditions injurious to their welfare. *In re D.M.*, 298 Ill. App. 3d at 580.

¶ 24    Although only one ground, if established, suffices to uphold the court's unfitness finding, we nevertheless note that the trial court's finding of unfitness on the grounds of failure to make reasonable progress was, likewise, not against the manifest weight of the evidence. Specifically, reasonable progress is an objective standard that requires, at a minimum, "measurable or demonstrable movement" toward reunification and allows the trial court to determine that "it will be able to order the child[ren] returned to parental custody in the *near future*." (Emphasis added.) *In re Daphnie E.*, 368 Ill. App. 3d 1053, 1067 (2006).

¶ 25    Here, the evidence reflected that respondent never progressed to increased or unsupervised visitation. In addition, the court found, based on the service plans, that respondent remained willfully resistant to learning and applying parenting techniques that would help correct the conditions that brought the children into care and he also remained unwilling to accept any responsibility and blamed Erica (a position he appears to maintain on appeal). Further, even if there were various delays in setting up services and he participated in the plan recommendations, the evidence nevertheless reflects that respondent was unsuccessfully discharged from individual therapy. Indeed, although on appeal he cites his involvement in services as reasonable progress, he also concedes that he was "still working" on additional items, such as "understanding why the case was opened, understanding how his mental health effects [*sic*] his parenting and children, completing individual therapy, understanding how partnership relationships effect [*sic*] his children and his parenting, and applying what he is learning to parenting." Respectfully, the court reasonably found that a continued lack of understanding on these issues (in particular concerning why the case was opened) does *not* demonstrate objective progress toward the goal of reunification. See *Daphnie E.*, 368 Ill. App. 3d at 1067. Where the evidence did not reflect that

the children could be returned to respondent's custody in the near future, the court's finding that there was not reasonable progress was not against the manifest weight of the evidence.

¶ 26                                III. CONCLUSION

¶ 27     For the reasons stated, the judgment of the circuit court of McHenry County is affirmed.

¶ 28     Affirmed.